**ALBERTA PORK PRODUCERS' MARKETING BOARD, et al., Plaintiffs,**

**The Canadian Meat Council, and Its Members, Plaintiff-Intervenors,**

v.

**UNITED STATES, Defendant,**

**National Pork Producers Council and Wilson Foods Corporation, Defendant-Intervenors.**

**Court No. 85–09–01257.**

United States Court of International Trade.

Aug. 7, 1987.

446

Cameron, Hornbostel & Butterman (William K. Ince and Caren Z. Turner), Washington, D.C., for plaintiff.

Arnold & Porter (Alan O. Sykes and Lawrence A. Schneider), Washington, D.C., for plaintiff-intervenor.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Dept. of Justice, Commercial Litigation Branch (Elizabeth C. Seastrum); Douglas Riggs, General Counsel, U.S. Dept. of Commerce, Washington, D.C., for defendant.

Thompson, Hine & Flory (Mark R. Sandstrom), Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Judge:

Plaintiffs bring an action under section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and 1516a(a)(2)(B) (Supp.III 1985), contesting the final affirmative subsidy determination by the United States Department of Commerce, International Trade Administration (Commerce) in *Live Swine and Fresh, Chilled and Frozen Pork Products from Canada,* 50 Fed.Reg. 24,097 (1985), and the final affirmative injury determination by the International Trade Commission (Commission) in *Live Swine and Pork From Canada,* Inv. No. 701–TA–224 (Final), USITC Pub. 1733 (1985), as those determinations relate to imports of Canadian live swine. Jurisdiction is provided under 28 U.S.C. §§ 1581(c) and 2631(c) (1982). Commerce's determination is sustained in part and remanded in part; the Commission's determination is remanded.

## I. BACKGROUND

In response to a petition filed by the National Pork Producers Council, representing domestic producers of live swine, and joined in by the Wilson Foods Corporation, a domestic producer of fresh, chilled and frozen pork, Commerce initiated a countervailing duty investigation, concerning imports of live swine and fresh, chilled and frozen pork from Canada, covering the period April 1, 1983 to March 31, 1984. 49 Fed.Reg. 47,079 (1984). Since Canada is a "country under the Agreement" within the meaning of section 701(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1671(b) (1982), the Commission was required to determine whether an industry in the United States is materially injured, or is threatened with material injury, by reason of imports of that merchandise. 19 U.S.C. § 1671(a)(2) (1982 & Supp. III 1985).

The Commission made a preliminary determination that there was a reasonable indication that an industry in the United States was materially injured by reason of imports of live swine and fresh, chilled and frozen pork from Canada. *Live Swine and Pork from Canada,* Inv. No. 701–TA–224 (Preliminary), USITC Pub. No. 1625 (1984). Commerce extended the time for making its preliminary subsidy determination based on a finding that the investigation was "extraordinarily complicated" under 19 U.S.C. § 1671b(c)(1)(B)(i) (1982). Commerce issued its preliminary determination on March 26, 1985, finding that certain benefits granted by the Canadian federal and provincial governments constitute subsidies within the meaning of section 1671(a)(1). *Live Swine and Fresh, Chilled and Frozen Pork from Canada,* 50 Fed.

Reg. 25,097 (1985). In June, 1985 Commerce issued a final affirmative subsidy determination as to twenty-three Canadian federal and provincial programs. 50 Fed. Reg. 25,097.

In its final determination the Commission affirmed its preliminary determination that the domestic industry producing live swine was materially injured by reason of imports of live swine from Canada. However, in a reversal of its preliminary findings, the Commission held that there was no material injury or threat of material injury to the domestic pork industry by reason of imports of Canadian fresh, chilled and frozen pork. USITC Pub. 1733. The Court affirmed the Commission's negative determination regarding fresh, chilled and frozen pork in *National Pork Producers Council v. United States*, 11 CIT ——, 661 F.Supp. 633 (1987). Plaintiffs, representing Canadian live swine producers, challenge various aspects of Commerce's subsidy determination and the Commission's injury determination, as those determinations relate to live swine.

## II. DISCUSSION

### A. The Commerce Determination

Plaintiffs argue that Commerce incorrectly concluded that seven programs conferred countervailable subsidies to Canadian swine producers since those programs do not provide subsidies "to a specific enterprise or industry, or group of enterprises or industries" within the meaning of 19 U.S.C. § 1677(5)(B) (1982). Plaintiffs say that Commerce improperly applied the "specificity test" to six farm income stabilization plans, one federal and five provincial, and to the Record of Performance (ROP) program for hogs, a joint Canadian federal/provincial herd testing program designed to help producers improve the quality of breeding stock. Plaintiffs also challenge Commerce's finding that the Ontario Farm Tax Reduction Program confers a countervailable regional subsidy, and argue that in any event Commerce improperly calculated the amount of that subsidy. At oral argument plaintiffs withdrew their claim that Commerce must reduce the

bonding/deposit rate to account for the elimination of certain payments to hog producers in fiscal year 1985, since that claim was the subject of a pending administrative review.

In countervailing duty cases the standard of review is not *de novo*. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). Rather, the standard is provided under 19 U.S.C. § 1516a(b)(1)(B) (Supp. III 1985), which states: "The court shall hold unlawful any determination, finding, or conclusion found— ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." The substantial evidence standard "frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform application of the statute." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966) (footnote omitted).

Substantial evidence is more than a mere scintilla. *See Carlisle Tire & Rubber Co. v. United States*, 10 CIT ——, 622 F.Supp. 1071 (1985). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Federal Trade Comm'n v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2015, 90 L.Ed.2d 445 (1986); *see Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Provided the determination is supported by a reasonable evaluation of the evidence on the record, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Electric Industrial Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984). Accordingly, the Court must give "tremendous deference" to the findings of the agency charged with making determinations under the statute. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983); *Carlisle Tire & Rub-*

*ber Co.,* 622 F.Supp. at 1075. Substantial weight is also given to the statutory interpretations of the agency administering the countervailing duty law. *Georgetown Steel Corp. v. United States,* 801 F.2d 1308 (Fed.Cir.1986); *see American Lamb Co. v. United States,* 785 F.2d 994, 1001 (1986) ("A reviewing Court must accord substantial weight to an agency's interpretation of a statute it administers."); *Canadian Meat Council v. United States,* 11 CIT ——, 661 F.Supp. 622, 625 (1987) (Commerce's statutory interpretation given weight when "based on a permissible construction of the statute").

▮ Plaintiffs' argument that Commerce erred in its finding that seven programs conferred countervailable subsidies, calls into question Commerce's application of the specificity test, which is used to determine whether governmental benefits constitute domestic subsidies under section 1677(5)(B). The specificity test has been the subject of broad analysis in prior decisions of the Court. *See PPG Industries, Inc. v. United States,* 11 CIT ——, 662 F.Supp. 258 (1987); *Cabot Corp. v. United States,* 9 CIT ——, 620 F.Supp. 722 (1985), *appeal dismissed,* 788 F.2d 1539 (Fed.Cir.1986), *reh'g denied,* May 22, 1986. These decisions have established that "domestic subsidies must be provided to a 'specific enterprise or industry, or group of enterprises or industries' to be countervailable." *PPG Industries,* 662 F.Supp. at 264 (quoting 19 U.S.C. § 1671(5)(B)). In distinguishing between subsidies that are provided to a specific group of industries and subsidies that are not so provided, "the appropriate standard focuses on the *de facto* case by case effect of benefits provided to recipients rather than on the nominal availability of benefits." *Cabot,* 620 F.Supp. at 732. As stated recently by the Court in *PPG Industries:*

> Although general availability may be a manifestation that a program has not conferred a benefit upon a specific recipient, general availability is not the statutory test. It is merely one of several relevant factors to be considered in determining whether or not a benefit or competitive advantage has been con-

ferred upon a "specific enterprise or industry, or group of enterprises or industries."

662 F.Supp. at 265; *see Al Tech Specialty Corp. v. United States,* 11 CIT ——, 661 F.Supp. 1206, 1212 (1987); *Can-Am Corp. v. United States,* 11 CIT ——, 664 F.Supp. 1444, 1448 (1987).

### 1. Federal Agricultural Stabilization Act Benefits

Approximately 83% of the countervailable subsidies found to have been bestowed on Canadian live swine are attributable to hog stabilization payments granted under the Canadian Agricultural Stabilization Act (ASA), which provides for the stabilization of prices of certain agricultural commodities. Commerce found that under Chapter A–9, section 10(1)(b) of the ASA, the Agricultural Stabilization Board is empowered to "pay to producers of an agricultural commodity ... the amount by which the prescribed price exceeds a price determined by the Board to be the average price by which the commodity is sold...." 50 Fed. Reg. at 25,100. Payments under the ASA are calculated for certain named commodities by determining a base price reflecting the average price of the commodity in representative markets for the preceding 5–year period. The prescribed price is then determined by taking a minimum 90% of the base price and adjusting for changes in production costs. After determining an average market return price for the year in review, a gross stabilization payment is calculated based on the difference between the prescribed price and the average market return price.

Hogs are among the named commodities for which prescribed prices are automatically calculated under the ASA. While other commodities may be considered for ASA payments if such commodities are designated as eligible for payments, prescribed prices are not automatically calculated for designated products, nor does the ASA provide a specific formula for determining their base price. In its final determination Commerce stated:

[W]e believe (1) that ASA payments are made to selected agricultural products in specific amounts, (2) that the specific rates of support provided depend upon the commodity in question, and (3) that there is governmental discretion in the administration of the various stabilization schemes.

50 Fed.Reg. at 25,101.

Plaintiffs argue that Commerce could not find specificity since the ASA establishes benefits for certain livestock (cattle, hogs and sheep), dairy products (industrial milk and industrial cream), and grains (corn, soybeans, oats and barley). They say under *Certain Fresh Atlantic Groundfish from Canada,* 51 Fed.Reg. 10,041 (1986), each product denotes a distinct industry for the purpose of determining specificity, and that the substantial number of named commodities precludes Commerce from finding that ASA benefits are provided to a specific group of enterprises or industries. Plaintiffs argue further that even if the named products constitute a specific group of enterprises or industries, ASA benefits are generally available both *de jure* and *de facto,* since ASA benefits may potentially be disbursed toward an even greater range of products if they are designated to receive payments, and that payments have actually been widely distributed on the basis of objective economic criteria since the program began in 1956.

■ The record supports Commerce's finding that benefits such as those received by hog producers are provided under the ASA only to a specific group of enterprises or industries. While general availability is a relevant factor in determining whether benefits are countervailable under section 1677(5)(B), *see PPG Industries, supra,* the ASA discriminates between commodities by providing pre-authorized, regular payments to producers of the named commodities, while offering unpredictable benefits to others who may apply for designation under the ASA. The ASA therefore grants hog producers benefits which are not generally available throughout the Canadian agricultural sector. The distinction drawn by Commerce between such benefits and those made available to producers of designated commodities is reasonable regardless whether the Canadian government is guided by objective factors in selecting designated commodities under the ASA. Commerce's determination that benefits received by hog producers under the ASA constitute subsidies within the meaning of section 1677(5)(B) is supported by substantial evidence on the record and in accordance with law.

2. Provincial Stabilization Programs

In addition to finding that ASA payments are countervailable, Commerce determined that five provincial stabilization programs are countervailable since those programs provide benefits to a specific industry or group of industries.

■ The Quebec Farm Income Stabilization Program is a stabilization plan established for producers of feeder hogs and weaner pigs, and administered by the Regie des Assurances Agricoles du Quebec (Regie). Farmers having a minimum production of 100 feeder hogs or owning at least fifteen sows are eligible to participate on a voluntary basis, but once enrolled, must continue in the program for 5 years. In any production year, the Regie makes cash advances against a year-end stabilization payment, which is based on a comparison of average market price with a production model designed to cover fixed and variable costs and producers' remuneration. The maximum number of feeder hogs on which stabilization payments is made is 5,000, and for sows, 400. Funding is provided jointly by producers and the provincial government in a ratio of 1 to 2.

In determining whether the provincial income stabilization plan confers benefits upon a specific group of enterprises ·or industries, Commerce considered the extent to which other agricultural commodities are covered by stabilization plans in the province, and whether other plans are provided on similar terms. Commerce found that the legislation establishing the Regie contains no limitations on the number of products that might be covered by a plan, but that only eleven commodities are actually

covered. Products are eligible for coverage only if a specific regulation identifying the product is adopted by the provincial government. Commerce found no evidence that decisions to stabilize incomes of producers of particular commodities are based on objective economic criteria. "Based on the information received, we find that Quebec's stabilization payments are made to selected agricultural producers and that the level of price stabilization and the terms of each scheme varies, at the discretion of the Regie, from commodity to commodity." 50 Fed.Reg. at 25,104.

Plaintiffs say that while Commerce was correct in finding that the Quebec program is *de jure* generally available, *see* 50 Fed. Reg. at 25,104, Commerce misconstrued the stabilization program by finding *de facto* specificity. They point out that 1) Quebec farmers participate in the program on a voluntary basis; 2) participants contribute or pay premiums to the fund from which disbursements are made; 3) commodities are covered by a plan based on "objective, non-discretionary, economic factors over which the government has no control"; and 4) all hog farmers receive compensation at the same rate.

Plaintiffs' arguments do not persuade the Court that Commerce's determination is not supported by substantial evidence or in accordance with law. The fact that participation in the stabilization plan is voluntary does not, as plaintiffs suggest, rebut Commerce's finding that stabilization payments are made to selected agricultural producers. Nor does the fact that producers make contributions detract from Commerce's finding. By providing a mechanism for subtracting producer contributions from the gross subsidy amount, the law makes clear that producer contributions do not negate the countervailability of subsidies. 19 U.S.C. 1677(6)(A) (1982) states:

> For the purpose of determining the net subsidy, the administering authority may subtract from the gross subsidy the amount of—
>
> (A) any application fee, deposit, or similar payment paid in order to qualify for, or to receive, the benefit of the subsidy, ...

Furthermore, plaintiffs' argument that the government has no control in determining which commodities are covered by stabilization plans is contradicted by the finding that the provincial government must pass specific regulations with respect to particular commodities in order for producers of such commodities to become eligible to receive benefits. Although Commerce requested internal memoranda, reports or studies that would help explain the deliberative process under which products become eligible for stabilization benefits, no details concerning the approval process were provided. Only uncorroborated assertions by plaintiffs' counsel were supplied. Information obtained by Commerce concerning the Quebec mink industry revealed only that an application for benefits by mink producers was rejected for "economic reasons." R.Doc. 201, at 6.

Finally, the argument that all Quebec hog farmers receive stabilization benefits at the same rate does not show that program benefits are not specifically provided to hog farmers. The pertinent inquiry is not whether some hog farmers benefit to a greater degree than others, but rather, whether hog farmers collectively form part of a specific group of enterprises or industries that benefit from government subsidies. The Court holds that Commerce's determination that Quebec Farm Income Stabilization benefits are provided to a specific group of industries is supported by substantial evidence in the record and in accordance with law.

Similar to the Quebec plan are the provincial stabilization programs of British Columbia, Manitoba, Saskatchewan and Prince Edward Island, which were found to confer countervailable subsidies by Commerce. Each program is administered by the provincial government in order to provide income stability for hog producers at times when market prices fall in relation to production costs. Like the Quebec plan, the programs are characterized by the voluntary participation of individual producers, government as well as producer contri-

butions, and restrictions on the number of hogs eligible for coverage.

The assistance programs are promulgated under laws establishing criteria under which members of a particular farm sector may become eligible for coverage under a stabilization plan. Commerce found that in British Columbia nine agricultural commodities other than hogs are covered, while in Manitoba and Saskatchewan stabilization plans exist for only one other commodity. 50 Fed.Reg. at 25,102–05. In Prince Edward Island hogs are the only agricultural commodity covered by a stabilization plan. *Id.* at 25,105.

Plaintiffs raise essentially the same arguments regarding these plans as discussed in connection with the Quebec plan. They argue further that the limited number of stabilized commodities in certain provinces is the result not of government discretion, but of inherent economic circumstances, such as the protection afforded other producers by their respective marketing boards, and the fact that most significant product sectors are covered by one program or another. Plaintiffs also assert that Commerce had an obligation to ascertain reasons why other producers had not requested stabilization.

Plaintiffs offer no proof that all agricultural products are protected by marketing boards or that such boards provide benefits comparable to those provided under stabilization plans. Even in Manitoba, where marketing boards exist for producers of dairy products, turkeys and eggs, there is no evidence on the record that those boards provide income support for farmers of those products. Furthermore, there is no evidence that stabilization plans exist for all "significant" commodities. The record documents instances where commodities such as grain corn and sheep remained uncovered by income stabilization programs despite substantial price declines for those products.

Plaintiffs also fail to provide support under the statute, caselaw, or administrative precedent for their assertion that Commerce must explore rationales as to why the provincial governments have established only those stabilization plans which exist in the provinces in question. The Court holds that the record is sufficient to support the finding as to the statutory question whether a domestic subsidy is provided to a specific industry or group of industries. The Court holds that Commerce's determination that the provincial stabilization programs confer countervailable benefits on a specific industry or group of industries is supported by substantial evidence in the record and in accordance with law.

### 3. Record of Performance Program

The Record of Performance (ROP) program for hogs is a herd testing program administered jointly by the Canadian federal and provincial governments which is designed to help hog producers improve their breeding stock and produce uniform and high quality pork at lower costs.

Plaintiffs argue that Commerce improperly found benefits received by hog producers under the ROP to be countervailable since that program is only a small part of the Canadian Agri-Food Development Program which conducts research for food and agricultural production generally. They assert that the ROP program for hogs provides statistical support evaluating breeding, reproductive physiology, and feeding and management systems, and that these services are substantially the same as those accorded all products in the agricultural sector. Plaintiffs claim that even if the specific ROP program established for hogs could be considered separate from other development programs in the overall agri-food program, Commerce's finding of specificity as to the hog ROP program is inconsistent with its finding that a similar program, the Hog Carcass Grading System, is not countervailable.

Commerce's determination that a specific group of enterprises or industries benefit from ROP programs is based on a finding that ROP programs exist only for hogs, beef, dairy cattle, sheep, poultry and honey bees. 50 Fed.Reg. at 25,101. Information collected by Commerce in its investigation

of the ROP program for hogs revealed the following:

> Purebred swine are tested for backfat, growth rate and feed conversion, in accordance with guidelines formulated by the Canadian Swine Record of Performance Advisory Board and Agricultural Canada. Information from the testing program enables within-herd ranking and comparisons of animals for genetic merit. The Canadian federal and provincial governments bear most of the cost of this program. Provincial government publications indicate that these programs have contributed to increased profits for hog producers, as a result of the improved market index of hogs and a decrease in the average age at market.

50 Fed.Reg. at 25,101

The government argues that the record contains evidence supporting Commerce's finding that benefits received by hog producers under the ROP program for hogs are benefits which are bestowed upon a specific group of enterprises or industries. A publication by the Regional Development and International Affairs Branch of the Canadian Agriculture Department lists the following objectives of the ROP program for hogs:

1. To provide a program which enables the seed stock industry to develop and supply the commercial swine industry with an input of breeding stock that is fully competitive with stock from other swine producing countries.

2. Develop a testing and evaluation program which provides optimum opportunity for selection.

3. Encourage and assist breeders in designing a breeding program which will permit effective genetic improvement within herd in order to meet industry needs.

4. To produce an industry structure which will result in the production of genetically superior stock on an adequate scale such that it can be dispersed throughout the industry with a resultant significant improvement

in the overall superiority of the final product.

R. Doc 20, Ex. ROP–6, at 3. Benefits such as these are not generally available, but are provided only to producers of the six commodities for which ROP programs exist. 50 Fed.Reg. at 25,101.

The government also argues that Commerce's finding that the ROP program for hogs provides countervailable benefits is not inconsistent with its determination that no countervailable subsidies are bestowed under the Hog Carcass Grading System. Unlike ROP programs, grading systems are provided under the Canada Agricultural Standards Act for all types of livestock, as well as for eggs, poultry, milk, vegetables, fruit, honey, maple syrup and leaf tobacco. R. Doc. 207, at 19. Grading and standards are also provided under five other federal acts, including the Canada Dairy Products Act and the Canada Grain Act. Id. at 19–20. Defendant also points out that grading systems, by providing uniform national standards, benefit consumers as much as producers, and "[t]hus, the grading system is a government program involving the health, safety, and welfare of all of a country's citizens." Brief for defendant at 85 (citations omitted).

■ The Court holds that Commerce was justified in determining that benefits received by hog producers under the ROP program for hogs are benefits which are bestowed on a specific group of enterprises or industries inasmuch as such benefits are bestowed only on producers of a limited number of agricultural products. Furthermore, the Court holds that Commerce was justified in determining that a governmental function such as grading provides benefits which differ in character from benefits which are bestowed under the ROP program for hogs, which have had the effect of improving the market index for hogs, lowering the average age at which the hogs go to market, and consequently, increasing profits for Canadian hog producers. 50 Fed.Reg. at 25,101; R. Doc. 217, at 25.

The prior determinations cited by plaintiffs are inopposite. Unlike the benefits

conferred by the ROP program for hogs, the favorable water rates at issue in *Fresh Asparagus from Mexico,* 48 Fed.Reg. 21,-618 (1983) were uniformly available to the entire agricultural sector. Likewise, in *Certain Steel Products from Belgium,* 47 Fed.Reg. 39,304 (1982), a particular Belgian research and development program was available to industries of broad range, not only to specified products within the agricultural sector. The Court holds that Commerce's determination that the ROP program for hogs confers countervailable benefits upon Canadian hog producers is supported by substantial evidence on the record and in accordance with law.

4. Ontario Farm Tax Reduction Program

The Ontario Farm Tax Reduction Program provides municipal property tax rebates to owners of farm properties in Ontario. Eligible farm owners received a rebate of 50% of their municipal taxes in 1983 and 60% in 1984. Commerce found that for a farm property to be eligible, annual municipal property taxes must be at least $20, and the farm must yield a gross annual production of farm products that are worth a minimum dollar value. 50 Fed.Reg. at 25,106. In 1983 the minimum production value for all farms was set at $8,000, but in 1984 a change was introduced to allow farms in Northern and Eastern Ontario to qualify with an annual production value of $5,000. Commerce was informed that the lower production requirements were established because weather conditions in those sections of Ontario are more severe than elsewhere in the province, and the $3,000 difference was intended to equalize eligibility for all Ontario farmers. *Id.* Commerce made the following determination:

Inasmuch as the eligibility criteria for this program vary depending on the region of Ontario where the farm is located, we determine this program to be a regional subsidy within the province, and therefore countervailable.

50 Fed.Reg. at 25,106.

Plaintiffs challenge Commerce's determination on the grounds that: 1) a rebate of taxes paid by Ontario farmers is not a government subsidy, but a return of the recipients' own money; 2) the program does not constitute a regional subsidy because basic eligibility is not limited to one region of Ontario; 3) Commerce improperly overcalculated the subsidy by including amounts paid to all hog producers in Ontario rather than only those amounts paid to farmers in Northern and Eastern Ontario who produce between $5,000 and $8,000 of agricultural commodities annually; and 4) since the disparity in the eligibility criteria occurred only in 1984, and the review period covered April 1, 1983 through March 31, 1984, Commerce's use of data from all of 1984 to determine the amount of the subsidy was improper.

▮ The Court does not agree with plaintiffs' argument that the Ontario Farm Tax Reduction subsidy is not countervailable because payments under the program represent portions of taxes paid by hog farmers that are rebated. No exception to the countervailing duty laws is provided for payments bestowed on producers based on a formula linked to tax payments. Nor is the program noncountervailable because eligibility for farmers producing more than $8,000 annually is not restricted to certain regions of Ontario. The fact that there is no regional discrimination among farmers producing goods valued above a certain minimum threshold does not compel the conclusion that no part of the program confers countervailable benefits.

A matter of greater concern is plaintiffs' argument that Commerce erroneously calculated the program benefits for bonding/deposit purposes by failing to adjust the subsidy amount to reflect only the benefits to those Ontario farmers in the Northern and Eastern parts of the province whose annual gross output was between $5,000 and $8,000. According to plaintiffs, Commerce's calculation is grossly exaggerated since "(1) it does not make any allowance for the fact that no farmer in Ontario whose products were valued at less than $5,000 received a rebate, (2) it does not take into account that farmers in the South and West producing between $5,000 and $8,000

did not receive a rebate, and (3) it includes non-preferential rebates to farmers earning over $8,000." Brief for plaintiffs at 75.

Plaintiffs rely on *Certain Fresh Atlantic Groundfish from Canada*, 51 Fed.Reg. 10,041 (1986) to show that Commerce must make adjustments to distinguish between benefits provided by a program that are preferential and those that are not. In that investigation, Commerce found that the subject program had four tiers, under which geographic regions were classified according to their relative economic development. The Regions designated under Tier IV, the most disadvantaged, received the highest share of assistance, while the least disadvantaged group, in Tier I, received the lowest share. Commerce did not determine that all benefits paid under the four-tier program were countervailable. Instead, Commerce compared the level of assistance provided to companies in Tiers II, III and IV to the average level of assistance provided to companies in Tier I and countervailed only against amounts exceeding the minimum level of assistance provided to Tier I companies. 51 Fed.Reg. at 10,045.

The record shows that Commerce was aware of the extent to which the Ontario Farm Tax Reduction program conferred preferential benefits: "This program is available to all Ontario farmers with a gross output valued at $5,000 or more in northern and eastern Ontario, and $8,000 or more in the rest on Ontario." R. Doc. 200, at 9. Nonetheless, when Commerce countervailed against the regional subsidy, its calculations were based on the total payments made to all hog producers in the province: "To calculate the benefit, we used as the best information available, that portion of the total payout under this program in fiscal 1984 that represents the proportion of swine production to total agricultural production in Ontario." 50 Fed. Reg. at 15,106.

Defendant does not dispute the propriety of making the adjustments urged by plaintiffs, but says "there simply is no evidence on the record upon which the ITA could have based such a calculation." Brief for defendant at 93. Defendant contends that the calculation of the subsidy is therefore supported by the "best evidence rule."

Under 19 U.S.C. § 1677e(b) (1982) Commerce may make determinations using "the best information otherwise available" whenever "a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required." But, assuming *arguendo* that resort to section 1677e(b) is justified, the method used by Commerce to calculate the subsidy still must be supported by substantial evidence in the record in order for the Court to sustain the determination on review. 19 U.S.C. § 1516a(b)(1)(B). "[I]n reviewing a countervailing duty rate determination by the ITA, the court must ensure that the ITA's methodology is a reasonable means of assessing the net benefit received as a result of the illegal subsidy or grant." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT ——, 636 F.Supp. 961, 966 (1986). "Suffice it to say, this court will not sustain a basis for the calculation of a subsidy ... which neither represents nor adequately estimates the allowance or benefit bestowed...." *Industrial Fasteners Group, American Importers Ass'n v. United States*, 3 CIT 56, 56 (1982) [Available on WESTLAW, DCT database], *aff'd*, 710 F.2d 1576 (Fed.Cir.1983).

The record in this case contains the following:

> [An official] stated that she could not break out farm tax reduction payments by type of recipient or county because that would involve manually going through all 120,000 files contained in her closetful of boxes. As stated above, we sampled a large enough number of applications to ascertain that all farm products received these municipal property tax reductions. *We have no idea, however, how many of these reductions were awarded to farmers in northern and eastern Ontario.*

R. Doc. 200, at 10.

The record shows that the subsidy calculation does not represent tax reduction benefits received by farmers located in Northern and Eastern Ontario with output val-

ued between $5,000 and $8,000. There is no evidence that shows aggregate program benefits closely approximate those countervailable amounts. It is possible, and even likely, that only a small amount of the total tax rebates were received by farmers in Northern and Eastern Ontario producing between $5,000 and $8,000 of goods per annum.

■ Commerce is not required to undertake in its investigation a search of 120,000 files to achieve perfection in its calculation. Such an investigation would prove impractical in light of the limitations on the agency's resources, which include strict time constraints, budgetary restrictions and the availability of qualified personnel. *See Ceramica Regiomontana, S.A.*, 636 F.Supp. at 968; *Industrial Fasteners Group*, 3 CIT at 56. But Commerce may use the best evidence rule only "as long as the information utilized is reasonably accurate." *Atcor, Inc. v. United States*, 11 CIT ——, 658 F.Supp. 295 (1987).

■ The Court holds that Commerce may not, without adjustment, use the entire payout under the tax reduction program for all hog producers as a basis for its calculation. Commerce's calculation of the Ontario Tax Reduction Program subsidy is not a reasonably accurate assessment of the countervailable benefit conferred under the program. In order to include this program in the subsidy determination, Commerce on remand must utilize a reasonable means of estimating the countervailable portion of the program benefits, and may supplement the record to include new evidence pertaining to the program.

Plaintiffs' final argument is that the calculation of the Ontario Farm Tax Reduction subsidy improperly fails to account for the fact that the eligibility criteria were uniform for all Ontario farmers for 9 months of the investigation period. The Court need only consider the propriety of Commerce's reliance on annual data if Commerce is able to perform a recalculation of the Ontario Farm Tax Reduction subsidy under the guidelines set forth above. But assuming Commerce will use the annual data in any remand calculation

it performs, it is useful to address this question at this time.

The government says that Commerce "did not possess the requisite quarterly data to calculate the subsidy rate precisely for the first quarter of 1984 and, in any event, the ratio upon which the ITA based the subsidy rate calculation would have been approximately the same, producing approximately the same subsidy rate figure, whether one quarter or four quarters (a full year) of data had been considered." Brief for defendant at 91. Commerce's justification for its use of a full year's data to obtain a ratio for calculating the subsidy rate raises again the reasonableness of Commerce's estimates in making a required calculation.

The Court must be satisfied that any formula designed by Commerce "adequately estimates" the subsidy. *Industrial Fasteners Group*, 3 CIT at 56. In calculating the Ontario Farm Tax Reduction subsidy, Commerce, in the absence of quarterly data, used the annual data as the best information available, on the assumption that the percentage of total program benefits paid to hog producers as opposed to all other agricultural producers is approximately the same in any quarter, assuming no significant increase or decrease in the proportion of hog producers to other agricultural producers involved in the rebate program. The final determination states:

> To calculate the benefit, we used as the best information available, that portion of the total payout under this program in fiscal 1984 that represents the proportion of swine production to total agricultural production in Ontario. By dividing that amount by the dress-weight equivalent of all hogs marketed [in Ontario] in fiscal year 1984, we calculated a subsidy rate....

50 Fed.Reg. at 25,106.

■ The Court holds that the method of using annual data as a means of deriving a ratio by which to calculate benefits paid to hog producers receiving countervailable benefits under the Ontario Farm Tax Reduction program provides an adequate means of estimating the subsidy bestowed.

If Commerce modifies its calculation to reflect estimated benefits received by farmers in Northern and Eastern Ontario with produce valued between $5,000 and $8,000, and determines the percentage of total program benefits paid to such farmers, Commerce may calculate the subsidy by using a ratio based on annual data, and the Court will review Commerce's calculation to ensure that this method of approximating the subsidy is reasonable as applied. Plaintiffs will be afforded an opportunity to comment on any recalculation in the remand results.

■ A final matter raised regarding Commerce's determination is defendant-intervenor's assertion that Commerce should have included among the subsidies found to benefit hog producers certain grants in the amount of one dollar per hog, made to one packer in Prince Edward Island by the Prince Edward Island Department of Agriculture and Marketing to defray the cost of hog processing and transport. Defendant-intervenor states:

> The subsidy given to the processor affected the price at which the processor could buy hogs from the producers. By knowing that it would receive $1.00 per purchased hog from the government, the processor was able to offer the hog producer a dollar more for each such hog than would have been the case without the subsidy. Obviously, therefore, the transportation payment resulted in a direct cash benefit to hog producers of $1.00 a hog.

Brief for defendant-intervenor at 45. The Court finds that this argument is not persuasive since defendant-intervenor offers no support in the record to substantiate its claim that the dollar per hog received by processors under this program resulted in direct cash benefits to hog producers. Accordingly, the Court holds that Commerce's determination not to include this subsidy among those found to benefit hog producers is supported by substantial evidence and in accordance with law.

B. The Commission Determination

Plaintiffs challenge the final affirmative injury determination, contending that the Commission erred: (1) in determining that the domestic industry producing live swine is suffering material injury; (2) in finding there is evidence that the alleged injury suffered by the live swine industry is caused by imports of Canadian live swine; and (3) in failing to determine whether there is a causal relationship between the subsidies given to the Canadian hog growers and the injury suffered by the United States domestic industry.

1. Determination that the Domestic Industry is Suffering Material Injury

In order to make a determination whether a domestic industry is materially injured by reason of imports, the Commission must consider "all relevant economic factors which have a bearing on the state of the industry," including:

> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

> (II) factors affecting domestic prices, and

> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C. § 1677(7)(C)(iii) (1982); see American Spring Wire Corp. v. United States, 8 CIT 20, 22–23, 590 F.Supp. 1273, 1276–1277 (1984) aff'd sub nom. Armco, Inc. v. United States, 760 F.2d 249 (Fed.Cir.1985). As in the case of Commerce, discussed above in part A. 4, the Commission may, when necessary, make its determinations under the best information rule of 19 U.S.C. § 1677e(b).

In its investigation of live swine, the Commission sent questionnaires to over 100 concerns randomly selected from a list of hog producers provided by the National Pork Producers Council. Responses were received from twenty questionnaire recipients, only thirteen of which were producers. According to the Commission, the thirteen responding producers accounted for a negligible share of United States hog production. The Commission determined that published secondary data provided a

more reliable source of information concerning the domestic hog industry due to the lack of concentration in that industry. *See* USITC Pub. 1733 at 8, n. 19 (producers having 500 or more hogs in 1984 accounted for only 6% of the 431,680 enterprises producing hogs). Relying on the published secondary data, the Commission found that the United States industry producing live swine is materially injured by reason of imports of Canadian live swine, based upon its consideration of relevant factors, including those set forth in section 1677(7)(C)(iii).

Plaintiffs assert that the Commission erred by failing to draw an adverse inference from the fact that a very small number of United States hog producers responded to the Commission questionnaires, relying improperly upon secondary sources as its primary source of information, and misinterpreting secondary source data as indicating material injury.

Plaintiffs' argument that the Commission was required to draw an adverse inference from the low response rate to the questionnaires is based on the discussion of the adverse inference rule in *International Union (UAW) v. N.L.R.B.*, 459 F.2d 1329 (D.C.Cir.1972), and prior determinations where the Commission has drawn adverse inferences, *e.g., Weighing Machinery and Scales From Japan*, Inv. No. 701–TA–7 (Final), USITC Pub. 1063 (1980). Plaintiffs, referring to the statutory language of the best information rule of 19 U.S.C. § 1677e(b), also argue that "[i]n the *Live Swine* investigation, the ITC ignored the statutory mandate, and interpreted equivocal information in a manner favorable to Petitioners' interest.... [S]uch action was contrary to law." Brief for plaintiffs at 102.

The adverse inference rule provides that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *International Union*, 459 F.2d at 1336. The rule is based on the natural inference that the reticent party fears to bring forth the requested information because such information would expose facts unfavorable to him. *Id.;* 2 J. Wigmore, Evidence § 285 (3d Ed.1940).

As noted by plaintiffs, the Commission has employed the adverse inference rule in prior investigations with regard to injury based on nonparticipation in the investigation. However, the statute directing the Commission to use the best information available does not, as plaintiffs suggest, require the Commission to draw an adverse inference from the failure of a party to complete questionnaires. Moreover, in *International Union,* the court made clear that the decision to draw an adverse inference is at the discretion of the agency as fact finder:

> The mere fact that the adverse inference rule is widely recognized and followed does not, by itself, demonstrate that the Labor Board commits reversible error when it declines to utilize it. Generally, as the dissent argues, whether to draw the inference is a matter of discretion for the fact finder. Administrative agencies are, of course, required to obey the minimal requirements of rationality ... and due process....

459 F.2d at 1339 (citations omitted).

The Court holds that the Commission has discretion in deciding whether or not to draw an adverse inference with respect to injury based upon a party's failure to participate in the administrative proceeding, but the decision in either event must be based upon a sound rationale. In investigations where the Commission is able to gather the necessary information through its subpoena power or other independent sources, there is very little reason to draw an adverse inference for failure to respond to questionnaires. *See Forged Undercarriage Components From Italy,* Inv. No. 701–TA–201 (Preliminary), Pub. 1394 (1983). The Court finds that the Commission properly exercised its discretion in electing not to draw an adverse inference from the low response rate to questionnaires by the domestic swine growers since the fundamental purpose of the rule to ensure production of relevant information is satisfied by the existence of the reliable secondary data.

Plaintiffs next assert that the Commission erred in relying primarily on the secondary sources of data rather than questionnaire responses, claiming that some questionnaire information contradicted the Commission findings based on the secondary sources. Plaintiffs concede that the low response rate to the questionnaires resulted in an inadequate sample of the domestic live swine industry, but argue that the discrepancies between the questionnaire responses and the secondary data, and the questionnaire responses themselves, indicate the Commission was required to obtain adequate primary source data.

■■■ The statute permits the Commission to use the best information otherwise available, and nothing in the statute or regulations prevents the Commission from using information other than questionnaire responses when the Commission determines that the responses do not provide an adequate basis for making its determination. *Cf. Chemical Products Corp. v. United States,* 10 CIT ——, 645 F.Supp. 289, 294–96 (1986). Even if some discrepancies exist between the secondary sources utilized and the few questionnaire responses received, this would not undermine the Commission's conclusion that the responses "tracked" the published data. USITC Pub. 1733 at 10. The Commission did not claim that the responses received consistently paralleled the secondary sources. The Court finds that the Commission's determination to rely primarily upon secondary sources of information as the best information available is in accordance with law.

Plaintiffs further assert that the Commission misinterpreted the secondary source data in finding that the domestic live swine industry is materially injured. Plaintiffs question the Commission's conclusions drawn from this data with respect to the trends in production, shipments and profitability in that industry.

The Commission determined that due to the nature of the industry, in that hogs are raised in open fields by small farmers who also produce other agricultural products (including other farm animals and feed for these animals and the hogs), "there are no discernible trends regarding capacity and employment." *Id.* at 8, n. 17. The Commission found that United States production of hogs decreased by 9% from 1981–82, increased by 9% in 1983, decreased by 7% in 1984 and increased slightly in January-March 1985 as compared with January-March of 1984. *Id.* at 8.

Noting that production figures represent pig births, including hogs not ready for slaughter and hogs that do not survive to slaughter weight, without reflecting changes in inventory, the Commission reasoned that domestic shipments representing hogs sold for slaughter are a more reliable indicator than production data for this investigation. The Commission found that "[d]omestic shipments of live swine fluctuated downward during 1981–84" and that "[t]he financial experience of the swine growers has reflected significant declines in profitability." *Id.* at 9.

■■■ In reviewing the Commission's findings, the Court is not authorized by Congress to substitute its judgment for that of the agency nor to reweigh the evidence on the record. Rather it must assess the evidence in order to find whether there is substantial support for the Commission's determinations. *Corning Glass Works v. United States Int'l Trade Comm'n,* 799 F.2d 1559, 1568 (Fed.Cir.1986). The Court finds that there is substantial evidence on the record to support the Commission's conclusions on production, shipments and profitability, and that these findings are based on a permissible interpretation of the secondary sources of information. The Court holds the Commission's determination that the domestic industry producing live swine is suffering material injury is supported by substantial evidence and according to law.

2. Evidence that Injury is by Reason of Canadian Imports

In making its determination whether the domestic industry has been materially injured by reason of imports, the Commission is directed by statute to consider among other factors:

(i) the volume of imports of the merchandise which is the subject of the investigation,

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

19 U.S.C. § 1677(7)(B) (1982). Plaintiffs contend the evidence does not support the Commission's findings regarding the three statutory factors.

With respect to evaluating volume of imports, the statute provides that "the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i) (1982). In this investigation, the Commission concluded that "[a]lmost all U.S. imports of swine originate from Canada" and found: "U.S. imports of Canadian swine more than doubled from 1981 to 1982, increased by 52 percent in 1983, and almost tripled from 1983 to 1984. During January–March 1985, imports of Canadian swine increased by 97 percent compared with the corresponding period in 1984." USITC Pub. 1733 at 12. The Commission also found that "[m]arket penetration by imports of Canadian swine increased steadily from 0.2 percent in 1981 to 1.6 percent in 1984," accounting for "2.6 percent of apparent U.S. consumption in January-March 1985." *Id.*

Plaintiffs argue that this increase in volume is insignificant when compared with the Commission's negative determination of material injury from Canadian pork imports in which market penetration was greater. *See* USITC Pub. 1733. Plaintiffs also point to other investigations where the Commission found even higher market penetration percentages to be insignificant. *E.g., Cast-Iron Pipe Fittings From Brazil,* Inv. No. 701–TA–221 (Final), USITC Pub. 1681 (1985); *Radial Ply Tires for Passenger Cars From Korea,* Inv. No 731–TA–200 (Preliminary), USITC Pub. 1572 (1984).

Plaintiffs' position is unpersuasive. Since the Commission determined that live swine and pork are distinct products produced by different industries, evaluation of the factors in the pork determination do not necessarily correspond to an evaluation of the factors in the live swine determination. *See National Pork Producers Council v. United States,* 11 CIT ——, 661 F.Supp. 633 (1987).

The Commission's determinations must be based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation. *See Armstrong Bros. Tool Co. v. United States,* 84 Cust. Ct. 16, 36–37, C.D. 4838, 483 F.Supp. 312, 328–29, *aff'd,* 67 CCPA 94, C.A.D. 1252, 626 F.2d 168 (1980) ("Commission's injury investigations are *sui generis,* and therefore injury must be decided by the Commission on a case by case basis"); *see also* S.Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381, 474 ("The significance of the various factors affecting an industry will depend upon the facts of each particular case.... For one industry, an apparently small volume of imports may have a significant impact on the market; for another the same volume might not be significant."); *see also* H.R.Rep. No. 317, 96th Cong. 1st Sess. 46 (1979). That a particular level of import penetration is or is not found significant with respect to one industry is irrelevant in the Commission's investigation of a different industry. *See SCM Corp. v. United States,* 4 CIT 7, 12–13, 544 F.Supp. 194, 199–200 (1982)) (citing *Armstrong, supra* ).

The Court finds that there is substantial evidence on the record to support the Commission's conclusion that the volume of Canadian imports of live swine is significant.

With respect to evaluating price effect, the statute directs the Commission to consider whether: "(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant

degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii) (1982). The Commission noted that live swine prices are very sensitive to changes in supply and used "elasticity estimates" submitted by the petitioners and respondents to estimate the effect on domestic swine prices of changes in the Canadian share of the integrated United States/Canadian live swine market.

An elasticity estimate is used to gauge the effect that changes in supply of a given product have upon prices for that product. The price elasticity of demand is defined as the percentage change in the quantity of a good for a 1% change in the price of the good, holding the prices of related goods and other factors constant. The coefficient of price flexibility is defined as the percentage change in the price of a good for a 1% change in quantity, holding the quantities of related goods constant. Demand elasticities can be translated into price flexibilities if necessary.

The Commission relied on a table contained in a report prepared by a staff economist which summarized the impact on United States swine prices and grower revenues due to changes in the Canadian share of the United States market for swine, using price flexibilities from Professor Futrell and Professor Grimes for petitioners and Professor Martin for respondents. *See* R. Doc. 101, Table 3. This range of elasticity estimates was used, according to the Commission, "because the complexity of economic relationships and the problems of econometric estimation make it impossible to obtain a precise estimate. The range presented is likely to include the actual elasticity." USITC Pub. 1733 at 13, n. 46.

Based on the summary report of the staff economist, the Commission found the estimates to show that "the Canadian share fell in 1983 and caused swine prices to increase by approximately $.19 to $.38 per hundredweight. Further, the Canadian share rose in 1984 and caused swine prices to decline by approximately $.64 to $1.27 per hundredweight," and based on United States Department of Agriculture forecasts projected "an increase in the Canadian market share of live swine for 1985 and resulting lower prices of approximately $.18 to $.36 per hundredweight." *Id.* at 13. Also in reliance on this summary report and the same price flexibilities, the Commission found that gross revenues were higher by approximately $36 million to $73 million in 1983, lower by approximately $118 million to $234 million in 1984, and projected to be lower by approximately $32 million to $64 million in 1985. *Id.* One Commissioner voting in the majority noted that the pricing data indicated that there was significant underselling and that a decline in United States prices generally occurred at the same time that Canadian imports rose. *Id.* at 14, n. 49.

Plaintiffs argue that the use of price elasticity estimates was not appropriate for determining whether Canadian imports of hogs caused significant price depression or suppression in the United States, contending such estimates are designed to measure the effect on prices due to changes in supply only even though hog prices are influenced by a wide variety of factors such as the price and availability of livestock feeds or substitute meats. Plaintiffs say alternatively that even if elasticity estimates may be relied upon such estimates are in error since the Commission did not test the confidence level of the estimates to determine if they meet a scientifically acceptable degree of certainty, and the estimates are derived from models that used changes in the supply of live swine and/or pork, rather than live swine only.

Plaintiffs moved to clarify and supplement the administrative record with an affidavit of Professor Martin indicating that his and other price flexibilities offered were for changes in live swine and pork supply rather than only live swine. Plaintiffs further state that there is no support in the record for a finding of significant underselling.

The Commission was aware that factors other than supply affected United States hog prices. However, as one Commissioner noted: "[E]xpert witnesses representing

both petitioners and respondents testified that increased Canadian supplies helped depress U.S. swine prices. The expert witnesses disagreed principally about the degree of price impact." USITC Pub. 1733 at 13, n. 45. The Court is required by the substantial evidence standard of review to "take into account whatever in the record fairly detracts from its weight." *SSIH Equipment S.A. v. United States Int'l Trade Comm'n,* 718 F.2d 365, 382 (Fed.Cir. 1983) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)); *see USX Corp. v. United States,* 11 CIT ——, 655 F.Supp. 487, 489 (1987). The Court is not persuaded that the evidence of these other contributing factors prevented the Commission from concluding that the Canadian imports of hogs depressed or suppressed United States prices to a significant degree.

■ Defendant further notes that the price elasticity estimates relied upon by the Commission to gauge the price effect of the imports take into consideration certain other contributing factors. In light of the documented relationship between hog supply and prices, the Court finds the Commission's reliance on price elasticity estimates is reasonable and according to law.

Plaintiffs assert such reliance is misplaced because the Commission did not test the "confidence level" of the estimates to determine if they meet a "scientifically required degree of certainty." Brief for plaintiffs at 120. While it is true that "[t]he Commission is not required to accept data which in the course of ordinary scientific research could properly be rejected," *Maine Potato Council v. United States,* 9 CIT 460, 462, 617 F.Supp. 1088, 1090 (1985), nothing in the statute requires that the Commission reassess data collected and accepted in its determination in order to verify its consistency with some ambiguous level of scientific reliability. In this case, the Court finds that the Commission was within its discretion when it accepted these estimates as a reliable indicator for judging the effect of Canadian imports on United States hog prices.

Plaintiffs argue that the Commission was misled by the summary report using the price elasticity estimates submitted by experts for petitioners and respondents because such estimates were based upon changes in the supply of pork and live swine rather than only live swine. Plaintiffs say that reliance upon these estimates that involve a product determined by the Commission to be different than live swine amounts to an error of law.

Defendant argues that the price elasticity estimates were derived from models that used strictly swine elasticities. Defendant further contends that the Commission did not rely exclusively on price elasticity estimates to determine the price depressing impact of increased supplies of Canadian live swine but also found that a decline in domestic prices occurred at the same time Canadian imports rose.

The Court finds the record at best ambiguous as to whether the three separate price flexibilities used in the summary report were derived from changes in live swine and/or pork or only live swine. These price flexibilities were submitted prior to the time the Commission issued its final determination that live swine and unprocessed pork are different products, and the data underlying these estimates might have been analyzed on the basis of the Commission's preliminary determination that swine growers and unprocessed pork packers should be treated as a single industry.

Exhibit C of the Commission's June 25, 1985 meeting apparently is the source of Professor Futrell's estimate of 2.0%. In that memo, Professor Futrell states:

Attached are summaries of estimates I have developed of the market impact of both Canadian and total hog and pork product exports to the U.S.

The exact price impact on hog prices *of additional pork supplies* cannot be estimated with complete certainty. However, research evidence for a number of years has fairly consistently indicated that *a one percent change in pork supply* has an inverse effect on prices of from 1.8 to 2.0 percent.

**464**

R. Doc. 86, revised 99, Exhibit C (emphasis added).

Similarly, the apparent source of Professor Martin's estimate is his statement submitted as exhibit Q in which he states:

Due to the increasing price competiveness of substitute foods, and the increasing concern of consumers over the healthfulness of red meats, *the demand for pork is becoming increasingly price elastic. My recent work on the economics of the pork industry* using annual, undeflated data, *suggests that the elasticity of demand is at least -1.0 during 1982–84*—thus, a one percent increase in supply will reduce price by no more than one percent. Furthermore, work completed by Coleman under my joint supervision with K.D. Meilke, using quarterly, deflated data, resulted in a price elasticity estimate of -1.18.

*Id.*, Exhibit Q (emphasis added).

Without further support than a notation on a memo pad, *see* R. Doc. 7E, the Court is not able to accept the staff economist's statement made in an earlier report that "[i]n conversation, Professor Martin says his estimate of 1.0 is for hogs and his estimate of 1.18 is for retail pork." R. Doc. 100 at 4. The source of Professor Grimes estimate of 2.0% with an adjustment for the price elasticity of United States supply is unclear, but even if only for live swine the other two professor's estimates indicate they might be derived from changes in supply of live swine and pork imports.

■ Since the Commission found live swine and pork to be different products, the Court finds the use of elasticity estimates which may be derived from changes in supply of pork and live swine is inappropriate for determining whether the injury to the live swine industry is by reason of the subsidized imports of live swine. The Court is not in a position to state either that the price flexibilities used were in fact for pork and live swine or whether the Commission knowing that they were, if they are, would reverse its determination.

The Court is not persuaded, however, that absent the evidence involving the price elasticities that the determination of the Commission is supported by substantial evidence. Only one Commissioner voting in the majority found that the decreasing prices for domestic live swine occurred at the same time that Canadian imports were increasing. *See* USITC Pub. 1733 at 14, n. 49. As a whole, the Commission states that "[t]he rapid increase in the Canadian share of the market at subsidized prices has had a disruptive effect on the U.S. market that, *combined with the depressing effect that this increased share had on swine prices,* leads us to conclude that the domestic industry has been materially injured by reason of the subject imports." *Id.* at 14 (emphasis added).

Having found a potential error in the data specifically relied upon by the Commission in reaching its determination regarding the depressing price effect of increased Canadian imports, the Court remands this action for determination as to whether the price flexibilities used in the staff economist's summary report, R. Doc. 101, are for only live swine. If these price flexibilities are not derived from data on live swine only, the Commission must reconsider its determination with respect to the effect of increased Canadian imports on United States live swine prices. The Commission may either obtain new data for its price elasticity estimates or identify and explain what data in the present record supports the redetermination.

One other contention raised by plaintiffs concerning prices warrants discussion. Plaintiffs assert that while there is no evidence in the record to support a finding of significant underselling, one Commissioner cited significant underselling by Canadian hog imports as a basis for an affirmative injury finding. Although defendant and defendant-intervenors cite certain tables and other data in the final determination as supporting the Commissioner's finding, *see* USITC Pub. 1733, App. at 43–50, plaintiffs say this data is not relevant because it provides a comparison of Canadian and United States prices rather than a comparison of the United States price of domestic

hogs and the price of imported hogs sold in the United States.

As stated by the court in *Maine Potato Council v. United States,* 9 CIT 293, 301, 613 F.Supp. 1237, 1245 (1985), "[w]hen comparing the price of United States goods with the price of imports, the Commission must compare prices at the level of actual competition in the United States market." However, it is unclear what data formed the basis for the Commissioner's finding that Canadian hogs "frequently undersold" domestic hogs in the United States. USITC Pub. 1733 at 14, n. 49.

 While the existence or lack of evidence of underselling is not determinative of whether domestic hog producers are materially injured by imports of Canadian hogs, any time the Commission relies on underselling to support its determination, it must support its finding of underselling with evidence in the record. Since the unexplained reference to underselling is not part of the Commission determination, but appears only in a footnote as a remark of one member of the majority, the Court will review the Commission's determination after remand to determine whether, without a finding of underselling by imported hogs, the Commission's determination contains sufficient evidence to support the injury finding based on "the effect of imports of that merchandise on prices in the United States...." 19 U.S.C. § 1677(7)(B)(ii) (1982).

3. Failure to Determine Causal Relationship Between Foreign Subsidies and Injury to Domestic Industry

 Plaintiffs argue that in this countervailing duty investigation the Commission is required to determine whether there is a causal relationship between the Canadian subsidies found by Commerce and the material injury suffered by the United States live swine industry. According to plaintiffs, such causal relationship must be found to exist before the Commission can make a final affirmative determination of injury.

This position closely parallels that taken by plaintiffs in *Hyundai Pipe Co. v. Unit-ed States Int'l Trade Comm'n,* 11 CIT ——, Slip Op. 87–18 (Feb. 23, 1987) [Available on WESTLAW, DCT database], *appeal dismissed,* No. 87–1326 (Fed.Cir. July 7, 1987). In that antidumping case, the Court held that the Commission is not required by Congress to consider in its causation analysis the relationship between the size of the dumping margins and the margins by which the imports undersold similar domestic products in the United States. Unlike plaintiffs in the present action, the plaintiffs in *Hyundai Pipe* argued only that margins analysis is one of several factors required to be considered in evaluating causation rather than outcome determinative on that issue.

The Court rejects plaintiffs argument. First, the language of the statutes, 19 U.S.C. §§ 1671d(b) and 1677(7)(B), (C) (1982 & Supp. III 1985), do not require the Commission to find a causal connection between the foreign subsidies and the injury to the domestic industry. Since Congress identified several factors which the Commission must consider, and did not include in such lists the relationship between the subsidy and the injury, Congress did not mandate that causation only be found if such causal connection exists.

The legislative history does not support plaintiffs' position. Plaintiffs cite to the Senate report from the Trade Agreements Act of 1979 where it is stated:

In determining whether injury is "by reason of" subsidized imports, the ITC now looks at the effects of such imports on the domestic industry. The ITC investigates the conditions of trade and competition and the general condition and structure of the relevant industry. It also considers, among other factors, the quantity, nature, and rate of importation of the imports subject to the investigation, and how the effects of the net bounty or grant relate to the injury, if any, to the domestic industry. Current ITC practice with respect to which imports will be considered in determining the impact on the U.S. industry is continued under the bill.... [T]he Commission must satisfy itself that, in light of

all the information presented, there is a sufficient causal link between the subsidization and the requisite injury.

S.Rep. No. 249, 96th Cong., 1st Sess. 57–58, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 443–44. This passage indicates that several factors may be considered by the Commission in determining causation and that no single factor controls. It is stated that the Commission considers "how the effects of the net bounty or grant relate to the injury, if any, to the domestic industry," *id.,* suggesting that such factor is a permissible consideration should it exist. This language does not mean that when a direct causal relationship between the bounty or grant and the injury to the domestic industry is not shown to exist then no causation between the subsidization (the subsidized imports) and the injury can be found and no final affirmative injury determination may issue.

The Court also holds that discussions of material injury for countervailing duty investigations contained in the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade, *done* April 12, 1979, *in force* January 1, 1980, 31 U.S.T. 513, T.I.A.S. No. 9619, *reprinted in* GATT, BISD, 56 (26th Supp. 1978–79), *and in* H.R. Doc. No. 153, 96th Cong., 1st Sess., pt. 2, 257 (1979) (Subsidies Code), do not unambiguously require that there be a causal connection between the foreign subsidy and the injury to the domestic industry seeking protection from subsidized imports. As stated in *Hyundai Pipe,* "[t]he Commission is within its discretion in administering the material injury test so long as its policies are consistent with the terms of the statute." Slip Op. 87–18 at 10. Thus the Commission's decision not to require a direct connection between the foreign subsidy and the injury to the United States industry is not rendered unlawful by the Subsidies Code.

Finally, the Court is not persuaded that in past countervailing duty investigations the Commission imposed upon itself a requirement that there be a direct causal relationship between the foreign subsidy and the material injury to the industry before a final affirmative determination could issue. The Commission has considered this relationship when conducting its causation analysis. *See Certain Carbon Steel Products from Belgium, France, Italy, Luxemburg, The United Kingdom, and the Federal Republic of Germany,* 47 Fed.Reg. 53,520, 53,521–53,-525, views of Commissioner Stern (discussing and citing several countervailing duty investigations where the amount of the subsidy was assessed in relation to the injury suffered by the domestic industry). Yet consideration of this relationship as one of the many pertinent factors in the causation analysis does not evidence a consistent agency practice to require the existence of such relationship before finding that the injury is by reason of the subsidized imports. The Commission's failure to discuss or determine whether such causal relationship exists in this case does not violate a consistent agency practice since one has never been established which required this relationship to be evaluated.

## III. CONCLUSION

Commerce's determination is remanded for recalculation of the countervailable portion of the subsidy received by Canadian hog farmers under the Ontario Farm Tax Reduction Program. The Commission's determination is remanded for reevaluation of evidence concerning price elasticities relied on by the Commission in its final determination.

Commerce and the Commission shall file the results of their remand proceedings with the Court within 45 days. Plaintiffs will thereafter have 15 days in which to file a brief on the remand determinations with the Court. Defendant and defendant-intervenors shall file a reply within 15 days after receipt of plaintiffs' brief.

So ordered.