USX CORPORATION, f/k/a United States Steel Corporation, Plaintiff,

v.

The UNITED STATES and United States International Trade Commission, Defendants,

and

Propulsora Siderurgica, S.A.I.C., Defendant–Intervenor.

Court No. 85–03–00325.

United States Court of International Trade.

March 15, 1988.

USX Corp. (John J. Mangan, J. Michael Jarboe, Craig D. Mallick and Robin K. Capozzi), Pittsburgh, Pa., for plaintiff.

Lyn M. Schlitt, General Counsel, James A. Toupin, Asst. Gen. Counsel and Timothy M. Reif, U.S. Intern. Trade Com'n, Washington, D.C., for defendants.

Mudge, Rose, Guthrie, Alexander & Ferdon (David P. Houlihan, Jeffrey S. Neeley), Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiff, USX Corporation, brings this action challenging the final determination of the United States International Trade Commission (ITC) that an industry in the United States was neither materially injured nor threatened with material injury by reason of imports of cold-rolled carbon steel plates and sheets from Argentina that were sold at less than fair value. *Cold-rolled Carbon Steel Plates and Sheets from Argentina*, USITC Pub. 1967, Inv. No. 731–TA–175 (March 1987) (Remand Determination). The March 1987 determination was the second determination in this investigation. The first negative determination, 50 Fed.Reg. 5136 (Feb. 6, 1985) was upheld by this court in February 1987 with respect to ITC's findings on like product, domestic industry and condition of the domestic industry. *USX v. United States*, 11 CIT ——, 655 F.Supp. 487 (1987).[1] Certain other aspects of that determination concerning the issues of causation, cumulation and threat of material injury were remanded to ITC by order dated February 9, 1987, for further investigation and analysis. Each of these issues will be discussed separately.

---

1. The like product was found to be cold-rolled carbon steel sheets and plates. The domestic industry is comprised of all domestic producers of like product.

## I. CAUSATION

In its previous opinion the court rejected ITC's majority causation analysis, stating that ITC's reasoning was not sufficient to support a negative determination. After determining that the domestic industry was materially injured, ITC concluded that less than fair value imports from Argentina were not the cause of material injury, basing its conclusion on two factors: First, ITC noted that although imports from Argentina rose consistently from 1981 to 1984 only "minimal market penetration" was achieved throughout the period of the investigation. Second, ITC found that while Argentine imports undersold domestic cold-rolled sheets by margins ranging from 5% to 14%, it could not confirm any actual instances of lost sales and revenue due to Argentine imports. *Id.* 655 F.Supp. at 489.

The court rejected ITC's analysis of market penetration because it "consisted solely of the statement that levels of market penetration remained low and stable ... [w]ithout discussing the significance of this trend or its relationship to other facts uncovered in the investigation...." *Id.* at 490 (footnote omitted). The significance of a quantity of imports and not absolute volume alone was especially relevant in this case, noted the court, given the fact that ITC had previously recognized that cold-rolled steel is inherently a price sensitive and fungible product and that "the impact of seemingly small import volumes [and penetrations] is magnified in the marketplace." *Id.* (quoting *Certain Carbon Steel Products from Spain,* USITC Pub. 1331,

at 16–17, Inv. Nos. 701–TA–155, –157 to –160, –162 (December 1982)).[2]

The court rejected the second part of ITC's causation analysis because ITC had relied exclusively upon instances of lost sales and revenue to show the effect of Argentine imports on the domestic industry after admitting that it had failed to investigate four of seven allegations of lost sales and all three reported instances of lost revenue. The court held that such an inadequate investigation, standing alone, could not support a negative determination, given proven consistent margins of underselling. *Id.* 655 F.Supp. at 491. ITC was ordered to undertake a more thorough investigation and consideration of these factors if they were to be the basis of the negative determination.

■ The court now has before it the results of the remand. "In order for the Commission's determination to be upheld in this case, the court must be able to discern from the determination that a majority of the Commission has based its conclusions upon legally sufficient reasoning." *BMT Commodity Corp. v. United States,* 11 CIT ——, 667 F.Supp. 880, 882, *reh'g denied,* 11 CIT ——, 674 F.Supp. 868 (1987), *appeal docketed,* No. 88–1188 (Fed.Cir. Jan. 22, 1988). The causation analyses separately set forth by at least two of the commissioners in the four person majority do not satisfy this standard of review. Therefore, the court has no alternative but to remand this action to ITC for analysis that is in accordance with law.[3] The two

2. A commissioner has raised a concern that the court has required ITC to explain how its various determinations are in harmony. There is no such requirement. Different factual settings will give rise to different results. If clear reasoning supporting a determination is lacking, however, the determination may appear to be arbitrary if viewed in the context of contrary determinations based on seemingly similar facts. Deviations from established agency practice or precedent, of course, must be explained.

3. Five separate opinions were issued on remand. Because one commissioner (out of five who acted on the matter) has dissented in the present action, ITC's negative determination can only be upheld if the court finds the views of at least three of the remaining four commissioners

to be in accordance with law. It would be poor judicial economy to review in detail the separate decisions of the commissioners who utilized traditional causation analyses, as the court does not know what approach will be taken by ITC on further remand. It is not clear that the investigation concluded to date will satisfy a majority of the commissioners under the standards set forth by the court. The court also notes, to the extent possible in a case of multiple opinions, commissioners should indicate the portions of their colleagues' opinions with which they agree. This might obviate further remands. Of course, a single majority opinion with the necessary dissents or additional views would expedite the review process.

analyses found deficient are addressed separately as follows.

### A. *The Five Factor Causation Analysis*

■ Plaintiff challenges the approach to causation analysis offered by one commissioner which would require ITC to consider five factors when determining whether the factual setting of a particular case merits an affirmative finding. According to the commissioner, "[T]he stronger the evidence of the following ... the more likely that an affirmative determination will be made: (1) large and increasing market share, (2) high dumping margins, (3) homogenous products, (4) declining prices and (5) barriers to entry to other foreign producers (low elasticity of supply of other imports)." Remand Determination at 14 (citing *Certain Red Raspberries from Canada*, USITC Pub. 1707, at 16, Inv. No. 731–TA–196 (June 1985)).[4]

Applying these factors in the present case, the existence of relatively high dumping margins was acknowledged along with substitutable imported and domestic product and downward pricing trends, all consistent with an affirmative finding, but it was concluded that "these factors are outweighed by the absence of barriers to entry, and the fact that cumulated import penetration is very low, which strongly suggests the absence of unfair price discrimination." Remand Determination at 19–20 (footnote omitted).

Plaintiff asserts that this approach to causation analysis "disregards the explicit statutory criteria provided by the Congress for the conduct of injury investigations," and transforms causation analysis into a methodology for determining the existence of a new unfair trade practice, namely, "unfair price discrimination." Response of USX Corporation to the Remand Determination of the International Trade Commission (Plaintiff's Brief) at 10 & 13. Alternatively, plaintiff argues that even if the court were to accept this approach to causation, "application of that analysis to the facts of this case overwhelmingly demonstrates the existence of injury by reason of imports." *Id.* at 14. In order to decide whether the opinion resting on this analysis is supported by substantial evidence and is otherwise in accordance with law, it is appropriate to examine the nature and relevance of the two determinative factors in greater detail, that is, low import volume and no barriers to entry.

In the previous opinion, the court recognized that import volume alone cannot be used to gauge accurately the effect of imports in the cold-rolled steel industry. The court directed ITC on remand to explain the significance of import volume or its relationship to other facts uncovered in the investigation. *USX*, 655 F.Supp. at 490–91. The limited discussion of market penetration presented here offers no such explanation. Instead, it is stated that, "[c]umulated imports accounted for less than 1 percent of apparent U.S. consumption during 1981, then increased to 1.4 percent in 1982 and 2.0 in 1983 [while] [i]mport penetration was 3.4 percent in January–September 1984 compared to 1.9 percent in the corresponding period of 1983." Remand Determination at 15. It is then concluded that, "[t]he cumulated import penetration of Argentina and Korea is very small and not consistent with a finding of unfair price discrimination." *Id.* This conclusory statement does not support a negative determination. It leaves unanswered the question of how the volume of imports relates to injury, particularly in the sense of the third statutory factor, impact on the domestic industry.[5] The court, therefore,

---

**4.** In *Copperweld Corp. v. United States*, 12 CIT ——, Slip Op. 88–23 (Feb. 24, 1988) the court sustained an ITC negative determination which also cited the five factor analysis discussed here. That opinion is distinguishable because the court held that the commissioner's views did not rest solely on the five factor analysis and the rationale of *Red Raspberries* was not considered

to be part of the determination. *Id.* at 30–31 and n. 12.

**5.** In determining whether the domestic industry is materially injured by less than fair value imports, the statute directs ITC to consider among other factors—

(i) the volume of imports of the merchandise which is the subject of the investigation,

is left to examine the fifth factor in the five factor causation analysis—barriers to entry —to determine whether it provides the missing link.

An attempt is made in the determination to justify use of the five factor test and reliance on barriers to entry, in particular, as the determinative factor, by equating unlawful dumping with a particular form of "unfair price discrimination." In *Red Raspberries*, cited in this determination in support of the five factor analysis, it is more specifically explained that the antidumping statute is intended to protect U.S. industry only from unfair price discrimination in the form of predatory pricing, as that term is defined in the determination. *Red Raspberries*, USITC Pub. 1707, at 13–14 (citing the legislative history of the Trade Act of 1974 (1974 Act), S.Rep. No. 1298, 93rd Cong. 2nd Sess. 179, *reprinted in* 1974 U.S. Code Cong. & Admin.News 7186, 7316). The *Red Raspberries* determination goes on to state that:

> Price discrimination can take several forms. The fact that Congress referred to *unfair* price discrimination suggests to believe that Congress meant some type of predatory pricing. Predatory pricing is a form of strategic behavior in which a firm lowers the price of its product below the marginal cost of production. Such behavior is only rational if the firm expects to be able to raise its prices in the future to a level at which it can more than recoup the losses it suffers in the present. Thus, predatory pricing can only be practiced by firms that have or expect to have market power.

*Red Raspberries*, USITC Pub. 1707, at 14–15 (footnote omitted) (citing R. Posner & F. Easterbrook, *Antitrust*, 98–99, 680 (2d ed. 1981)). The problem with this position is two-fold. One flaw is that this view necessarily makes the intent of a foreign produc-

> (ii) the effect of imports of that merchandise on prices in the United States for like products, and
> (iii) the impact of imports of such merchandise on domestic producers of like products.

19 U.S.C. § 1677(7)(B) (1982).

er the focus of the ITC causation inquiry. Another, but not unrelated flaw, is that this view seems to assume that the purpose of the antidumping statute is to prevent a particular type of "injury to competition" rather than merely material "injury to industry."

The "injury to industry" versus "injury to competition" distinction in international trade laws dates back to the early part of this century. The Antidumping Act of 1916 (codified at 15 U.S.C. §§ 71–77 (1982)) was enacted by Congress as an unfair competition law focusing specifically on the practice of predatory dumping. *See* Hiscocks, *International Price Discrimination: The Discovery of the Predatory Dumping Act of 1916*, 11 Int'l Law. 227 (1977). The 1916 Act imposed criminal sanctions on anyone importing articles into the United States:

> [A]t a price substantially less than the actual market value or wholesale price ... *Provided,* That such act or acts be done with the intent of destroying or injuring an industry in the United States, or of preventing the establishment of an industry in the United States, or of restraining or monopolizing any part of trade and commerce in such articles in the United States.

15 U.S.C. § 72 (1982). Although the Act mentions injury to industry, the entire thrust of the statute, including the intent requirement, cause it to be recognized as a particular type of antitrust statute. *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 494 F.Supp. 1190, 1223 (E.D.Pa. 1980), *aff'd, in part, reversed, on other grounds, and remanded, sub nom., In re Japanese Electronics Products Antitrust Litig.*, 723 F.2d 319 (3d Cir.1983), *cert. denied* —— U.S. ——, 107 S.Ct. 1955, 95 L.Ed. 2d 527 (1987) (No. 86–1453); 723 F.2d at 325 & n. 4.[6]

**6.** In an appeal from a separate opinion of the third circuit in that case, the Supreme Court declined an invitation to review the decision regarding the Antidumping Act of 1916. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 579 n. 3, 106 S.Ct. 1348, 1352 n. 3, 89 L.Ed.2d 538 (1986).

In the Antidumping Act of 1921, however, Congress inserted an injury test considerably more sensitive to conditions in the domestic industry. Antidumping Act of 1921, ch. 14, § 201, 42 Stat. 11 (repealed 1979) (formerly codified, as amended, at 19 U.S.C. § 160(a) (1976)). Likewise, the Trade Agreements Act of 1979 (1979 Act), which repealed the 1921 Act and re-enacted its provisions, as amended, into the Tariff Act of 1930, states that antidumping duties are to be imposed only upon a showing that a domestic industry is materially injured, threatened with material injury or that the establishment of a domestic industry is materially retarded by reason of less than fair value imports. 19 U.S.C. § 1673 (1982).

As indicated, the interpretation under discussion of the antidumping statute reflects a belief that despite the lack of express limitation in the statutes, Congress intended that dumping duties be enforced only if a certain form of anticompetitive behavior is occurring. The analysis begins with the assumption that foreign firms behave as rational profit maximizers. From this assumption follows the statement that:

> [I]f the factual setting in which the unfair imports occur does not support a finding that there is any gain to be had by unfair price discrimination, it is reasonable to conclude that any injury or threat of injury to the domestic industry is not 'by reason of' such imports.

Remand Determination at 13.[7] To fully comprehend the impact of this statement it is important to note the additional comments that unfair price discrimination is predatory pricing in the form of pricing below the marginal cost of production and that no gain can be had by such price discrimination unless an exporting firm ultimately is able to raise its prices in the U.S. market to take advantage of its increased market share. See supra p. 65 (quoting from Red Raspberries, USITC Pub. 1707, at 14–15). It is further stated that a firm will be unable to raise prices if other nations are capable of exporting to the U.S. at competitive prices. Under this analysis, gainful dumping cannot be accomplished and, therefore, proof of causation of injury by dumped imports will not exist, unless there are barriers to entry of other imports. Thus, contrary to defendants' argument, this fifth factor is not just one of many relevant factors, but its absence likely will produce a negative determination in all cases relying solely upon the five factor test.[8]

The view reflected in the determination rests upon the principle that pricing that is above the marginal cost of production cannot be said to be contrary to acceptable profit maximizing behavior, as a general matter. See R. Posner & F. Easterbrook, Antitrust, 680–686 (2d ed. 1981)[9]; Barceló, Antidumping Laws as Barriers to Trade —The United States and the International Antidumping Code, 57 Cornell L.Rev. 491, 504–06 (1972). Under this view, only pricing below the marginal cost of production can be said, with any certainty, to be uneconomic and anticompetitive. Thus, by asking whether, rationally, goods would be priced below the marginal cost of production, the commissioner asks whether the

---

7. In Red Raspberries, an additional reason was given as to why the absence of like product imports from other countries would support an affirmative finding on causation, namely that "it provides some assurance that the injury to the domestic industry is by reason of the investigated imports and not caused by imports from other countries." USITC Pub. 1707, at 17. In this case, however, this explanation of barriers to entry appears for the first time in defendants' brief in support of the remand determination and it does not appear that the significance of barriers to entry was analyzed in this manner. Furthermore, the statement made in Red Raspberries in 1985 may have contemplated standards for cumulation which have been held to be contrary to law.

8. This is demonstrated in this case because only the fifth factor is available to relate volume to price effect and impact to produce a negative result. The other factors were affirmative.

9. This work is relied upon in Red Raspberries which has been cited as a fuller statement of the views expressed here, thus the court assumes that the definition of marginal cost of production contained therein is also accepted. It is "change in total costs brought about by increasing (or decreasing) output by one unit." Posner & Easterbrook, supra, at 684.

pricing is unacceptably anticompetitive, not whether it is injurious to the industry in some other material way.[10]

In international trade it is the object of an "injury to competition" causation test to protect the competitive process itself and not necessarily individual competitors. *See* Barceló, *supra*, at 513–17. Under the view expressed in the determination, only predation of the type described furnishes the requisite causation of injury to competition.[11] The "injury to industry" causation standard, however, focuses explicitly upon conditions in the U.S. industry. *Id.* In effect, Congress has made a judgment that causally related injury to the domestic industry may be severe enough to justify relief from less than fair value imports even if from another viewpoint the economy could be said to be better served by providing no relief. The court, by finding the test applied here invalid, does not condemn for all cases any inquiry into effects on competition; such inquiry can be a useful way of exploring the causation issue. Such an inquiry, however, cannot supplant the inquiry required by statute. Thus, any causation analysis must have at its core the issue of whether the imports at issue cause, in a non *de minimis* manner, the material injury to the industry which has been found.[12]

To avoid confusion regarding the legislative history cited in the determination, further comment is needed on the concept of rational profit maximization. As noted, at the core of the five factor analysis is the assumption that all producers act as rational profit maximizers. It is not universally accepted, however, that producers of goods

for export always act in such a manner. In recent years, many foreign export industries have been nationalized, or at least subjected to increasing political pressures. It has been stated that these industries no longer seek to enhance profits as much as they attempt to pursue national social goals such as full employment. *See* Fisher, *Dumping: Confronting the Paradox of Internal Weakness and External Challenge,* 1 Mich Y.B. Int'l. Legal Stud. 11, 19–23 (1979). Exporters who do not act as rational profit maximizers might be willing to sell at less than fair value even though there is no foreseeable potential for gaining an increased market share and raising prices. Such behavior could cause permanent, continuing injury to the domestic industry, contrary to the view discussed. The commissioner apparently believes that Congress did not intend to address any such problem that might exist.

In support of the rational profit maximizer approach, the commissioner quotes from the legislative history of the 1974 Act, S.Rep.No. 1298, *supra,* at 179: "importers as prudent businessmen dealing fairly would be interested in maximizing profits by selling at prices as high as the U.S. market would bear." Remand Determination at 12–13. The statement, however, was not placed in the legislative history to establish an axiom about the conduct of producers of exports or to impose an injury by predation standard. It appeared in the context of a general discussion about "technical dumping," which occurs when foreign imports' margins of underselling exist because there is a shortage of supply in the U.S. market. S.Rep. No. 1298, *su-*

10. The Supreme Court in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986) observed that "predatory pricing schemes are rarely tried, and even more rarely successful." (The court was concerned with a claim of conspiracy under section one of the Sherman Act, but its discussion of predatory pricing was more general.) Congress certainly has been aware of the scope and complexity of administration of the antidumping laws, so much so that it frequently has amended such laws and has approved considerable spending to keep elements of government functioning to carry out those laws. Presumably, Congress, in approving such

legislation, intended to protect industries in the United States from something other than a rare and unusual occurrence.

11. Others who favor the "injury to competition" approach might recognize as injurious behavior which does not reach the level of predation described.

12. Defendants argue that ITC has applied the proper standard because it found injury to industry. This is true, but if its causation analysis relates only to injury to competition in the form of predatory pricing as defined here, ITC has ignored its basic finding.

pra, at 179. By adopting the language of this section out of context as support for the entire predatory pricing analysis, the determination expands the concept of technical dumping to include any case in which there are no barriers to entry. The court believes that analysis from the point of view of rational profit maximization is necessary in many situations, but the seeming acceptance of this view by Congress in some instances does not support the application of the five factor analysis used here. Even if one agrees that one must assume rational profit maximizing behavior, it does not follow necessarily that one must also accept an injury by predation standard. Rational profit maximizers might engage in behavior which is injurious to an industry in a way that cannot be described as predatory in the sense used here but is nonetheless prohibited by the antidumping laws.

As indicated, the commissioner has expressly cited ITC's *Red Raspberries* determination as a fuller statement of the views expressed here. There it is stated that statutory causation factors such as volume and pricing data are nothing more than "useful proxies" for a "direct inquiry into the intent of a foreign producer [which] would be difficult at best." *Red Raspberries*, USITC Pub. 1707, at 16. As stated, it is the 1916 Act which focuses on intent. In applying the antidumping law under which this action is brought it is improper for ITC to place at the center of its causation analysis the intent of a foreign producer. This inquiry is unavoidable, however, if one equates unlawful dumping with unfair price discrimination in the form of predatory pricing. Unlike the 1916 Act, there is neither a scienter requirement to be found in the statute relevant here, nor evidence in the relevant legislative history that Congress intended such a requirement. Thus, contrary to the suggestion in defendants' brief, what occurred in this case is not the mere incorporation of another relevant economic factor into a causation analysis as is

clearly permissible under 19 U.S.C. § 1677(7)(B)–(C) (1982). Instead, the nature of the reliance on the barrier to entry factor has worked to change the focus of the injury investigation in a manner not permitted by Congress.

### B. *Causation Analysis Based on an Elasticity Estimate*

■ The economic approach to causation analysis offered by another commissioner attempts to determine whether the domestic industry has been injured by reason of less than fair value imports by looking specifically at the effects of imports on domestic shipments, domestic prices and domestic sales in a unique way.

In order to determine the effect on domestic shipments, it is assumed that if importers had to pay fair value for the subject Argentine goods, those goods would be priced out of the U.S. Market entirely and the resulting business would all go to U.S. firms.[13] Remand Determination at 28. Using 1983 as an example, this would mean that "the 130,000 short tons imported from Argentina would have been added to the 12,972,000 short tons supplied by U.S. firms." *Id.* at 29 (footnote omitted). From this, it is found that "the dumped imports from Argentina reduced domestic shipments by at most 1 percent." *Id.*

"[A]n *upper bound* for the degree to which dumped imports suppressed domestic prices" is next calculated using an elasticity of domestic supply estimate provided by the Department of Commerce's Office of Economics. *Id.* According to this estimate, "a 1 percent increase in domestic price will produce a 3.5 percent increase in the quantity supplied by domestic producers." *Id.* at 29–30 (footnote omitted). It is then stated that, "[t]his also means that a 1 percent increase in demand for domestic product will lead to an increase in domestic price of only 0.29 percent (equals (1/3.5) times 1 percent).... Thus the maximum

---

**13.** As the commissioner points out, this assumption is favorable to the domestic industry in two respects. It assumes the entire dumping margin was passed through to reduce the price of Argentine imports, and it assumes that none of the business lost by the Argentines, if they were forced to sell their goods at fair value, would go to other foreign suppliers such as Brazil and Korea.

degree of price suppression in this case is 0.3 percent." *Id.* at 30.

Finally, calculating lost sales, it is found that "since dumped imports reduced domestic shipments by 1 percent and suppressed domestic prices by 0.3 percent, this means that dumped imports reduced industry sales by only 1.3 percent (1 percent + 0.3 percent.)" *Id.* Based on these calculations, it is concluded "that the adverse effects on the domestic industry from dumped imports from Argentina were very tiny.... [and] that dumped imports from Argentina were not a cause of material injury." *Id.* at 31.

Plaintiff argues that this theoretical economic analysis "ignores the statutory indicia of injury," Plaintiff's Brief at 16–17; that the data relied on, namely the report of the Office of Economics, is not evidence which may support a final determination, *id.* at 17–18; that this approach "fails to articulate any rational[ ] connection between the results of [the] elasticity analysis and [the] negative determination," *id.* at 19; and that unlike prior cases in which economic analysis of this sort has been approved by the court, this analysis "lacks any inherent showing of confidence and was employed in a manner which excluded any participation by any of the parties to the proceedings below." Plaintiff's Reply Brief at 17.

While this approach to causation analysis has the potential for explaining, within the confines of the statutory framework and in an improved manner, how less than fair value imports affected the domestic industry, its utilization here must be rejected because of the exclusive reliance on an elasticity estimate which the determination does not link to the specific facts of this case. This court has approved the use of valid economic models to assist ITC in its causation analysis. In *Alberta Pork Producers v. United States*, 11 CIT ——, 669 F.Supp. 445 (1987), the court held that ITC may accept price elasticity estimates as a reliable indicator for judging the effect of imports on U.S. prices. Responding to plaintiff's argument that such reliance was misplaced because ITC "did not test the confidence level of the estimates to determine if they meet a scientifically acceptable degree of certainty" *id.* 669 F.Supp. at 462, the court stated:

> While it is true that "[t]he Commission is not required to accept data which in the course of ordinary scientific research could properly be rejected," *Maine Potato Council v. United States*, 9 CIT 460, 462, 617 F.Supp. 1088, 1090 (1985), nothing in the statute requires that the Commission reassess data collected and accepted in its determination in order to verify its consistency with some ambiguous level of scientific reliability.

*Id.* at 463. As in *Alberta Pork*, this court does not require that ITC establish the accuracy of elasticity estimates to a scientific degree of certainty before they may be used, but this does not preclude a requirement that some threshold degree of reliability be established in the record if commissioners are to rely almost exclusively on such estimates in fulfilling their statutorily mandated task.

In *Alberta Pork*, the court concluded that ITC's reliance on price elasticity estimates was reasonable and in accordance with law, "[i]n light of the documented relationship between hog supply and prices...." *Id.* Before deciding to rely on these estimates, ITC heard expert witnesses representing both parties testify "that increased Canadian supplies helped depress U.S. swine prices." *Id.* at 462–63. ITC also accepted estimates submitted by both sides' experts and ultimately chose to rely on a "range of elasticity estimates ... 'because the complexity of economic relationships and the problems of econometric estimation makes it impossible to obtain a precise estimate.'" *Id.* at 462 (citation omitted). This expert testimony and adversarial participation in the administrative process below helped assure the basic reliability of the estimates subsequently relied on.

By contrast, in the present case, as plaintiff notes, "the parties were not permitted to participate—by review, comment or otherwise—in the economic evaluation and the elasticity derivations employed...." Plaintiff's Reply Brief at 18. This particu-

70

lar elasticity analysis was applied to this product for the first time on remand and was done without seeking input from any of the parties. *See Id.* The basic reliability of the elasticity estimate is, therefore, being addressed for the first time on the occasion of judicial review.

Having thoroughly examined the record before this court, it appears as if the source of this estimate is questionable at best. The estimate is taken from a study published in 1981, which seems to be based on data compiled between 1956 and 1976. Confidential Record Document Number (CR) 17, at 24 n. 3 & 28 n. 1 (supplemental analysis by the Office of Economics, citing R. Crandall, *The U.S. Steel Industry in Recurrent Crises* (Brookings, 1981)). It is at least an open question as to whether data compiled for periods which were decades prior to this investigation can reliably be used to establish assumptions about the state of the current steel industry given subsequent advances in technology and other changes in the industry. This question cannot be ignored by ITC if the elasticity estimate is to control the result. Furthermore, the 3.5 estimate relied upon refers to the carbon steel industry in general and nothing in the record indicates why an estimate for the industry in general may be used to reach conclusions regarding only one segment of that industry—cold-rolled plates and sheet. CR 17, at 28 n. 1. In addition, it is only one of a number of elasticity estimates mentioned in the record and no explanation is offered by the commissioner as to why it is the best one.

In *Alberta Pork*, though the court approved the use of elasticity estimates in general, it rejected the use of estimates that did not describe the specific product under consideration. Presented with a record that was "at best ambiguous as to whether [elasticity estimates] were derived from changes in live swine and/or pork or only live swine [prices]," 669 F.Supp. at 463, the court remanded the action to ITC for a determination as to whether the estimates were only for live swine. *Id.* at 464.

If a commissioner finds it appropriate to address causation analysis in this case by means of a mathematical equation, that commissioner must provide the court with an explanation of why the factors in this equation are reliable in terms of the case at issue. Furthermore, unlike *Alberta Pork* where elasticity estimates were used only in evaluating price effects of subject imports, the estimate has been used here to calculate both price effects and impact on domestic industry. The very centrality of the estimate to the causation analysis reinforces the need for explanation. The fact that assumptions favorable to the domestic industry have been incorporated into the calculations will not save an analysis flawed at its core.

■ Finally, even if the court were to assume that the elasticity estimate used was a reliable indicator for this case, this analysis is still in need of further explanation before the court can conclude that it is based upon substantial evidence and in accordance with law. Particularly puzzling is the methodology for calculating lost sales. Rather than relying on specific evidence of lost sales, the commissioner employs a single equation.[14] *See supra* pp. 68–69 (quoting Remand Determination at 30). Presumably, there is a coherent explanation of the derivation of the equation which could be set forth. Until such equations are accepted as the everyday subject of antidumping decisions, however, they must be explained for the benefit of the parties and the court. Furthermore, there would appear to be some alternatives to analysis of the impact of imports apart from reliance on anecdotal lost sales data or the untested universal equation utilized here. Where the equation is so central to the conclusion, relating it to some data from the actual case under investigation (in addition to import volume), and allowing the parties to comment on it, would seem prudent. Thus, at least two of the four opinions constituting the majority are legally flawed and not based on substantial evidence.

14. The commissioner notes some evidence of record that might show lost sales due to less than fair value imports. She views the evidence as anecdotal and generally "not probative on the issue of causation." Remand Determination at 30.

## II. CUMULATION

As indicated in the court's previous opinion, while cumulation was not statutorily mandated in investigations commenced prior to the Trade and Tariff Act of 1984 (1984 Act), it might nonetheless be arbitrary and an abuse of discretion for ITC to refuse to cumulate where the conditions of trade indicate cumulation would be appropriate. *USX,* 655 F.Supp. at 491–92. With a single exception,[15] the commissioners have elected on remand, as in the previous determination, not to cumulate the imports from Argentina with those from any other country. Rather than focusing on the conditions of trade in all instances, a majority of commissioners have cited a number of other reasons in support of their decisions not to cumulate Argentine imports with imports from Brazil, South Africa and Spain.[16] These reasons are discussed below.

Defendants state that:

Under pre–1984 law, it was well-established Commission practice not to cumulate imports that were the subject of an investigation (i) in which the Commission had determined that an industry in the United States was not materially injured or threatened with material injury by reason of the subject imports, (ii) that had been terminated prior to the issuance of a final determination by the Commission or (iii) in relation to which the petition had been withdrawn.

Defendants' Brief at 63. Defendants note that it is not appropriate to cumulate in these situations, "because the subject imports had not been and would not be finally determined to be materially injurious to a U.S. industry and were not the subject of a pending investigation." *Id.* at 64.[17] Additionally, a number of commissioners refuse in this case, and have refused in past determinations, to cumulate imports that are already the subject of an order imposing duties under the antidumping or countervailing duty statutes, reasoning that once duties are levied these imports "cease being unfairly traded." *See id.* at 68.

In the present case, antidumping investigations were commenced against South Africa, Spain, and Argentina, among others, in response to plaintiff's petition. *Carbon Steel Products from Argentina, Australia, Finland, South Africa, and Spain,* 49 Fed.Reg. 6,808 (Feb. 23, 1984). Plaintiff chose to withdraw its petitions with respect to imports from South Africa and Spain in order to facilitate entry into Voluntary Restraint Agreements (VRA) with those countries.[18] At the times the petitions were withdrawn, the imports of both countries had been the subject of an affirmative ITC preliminary determination. *Carbon Steel Products from Argentina, Australia, Finland, South Africa, and Spain,* 49 Fed. Reg. 13,442 (Apr. 4, 1984). The Spanish imports were also the subject of an affirmative ITA final less than fair value determination. *Carbon Steel Products from Spain,* 49 Fed.Reg. 48,582 (Dec. 13, 1984).

It is the position of several commissioners that once petitions are withdrawn, imports covered by those petitions are fairly traded and cease to be candidates for cumulation in the subject investigation. *E.g.* Remand Determination at 7. Furthermore, defendants state:

---

**15.** On remand, one commissioner has read the court's prior opinion to mandate cumulation of imports from Korea with imports from Argentina.

**16.** ITC has also refused to cumulate imports of Mexico which had been subject to a countervailing duty investigation terminated in April 1984 when plaintiff withdrew its petition. *Carbon Steel Products from Mexico,* 49 Fed.Reg. 17,790 (Apr. 25, 1984). Though plaintiff originally urged ITC to include Mexico as a candidate for cumulation, it does not presently challenge their decision not to do so.

**17.** The court does not address the standard applicable to actions governed by the 1984 Act which contains a provision mandating cumulation, on a different basis than that discussed here, of imports "subject to investigation." 19 U.S.C. § 1677(7)(C)(iv) (Supp. III 1985).

**18.** Plaintiff withdrew its petition covering South African imports in May 1984, 49 Fed.Reg. 23,-670 (Jun. 7, 1984), and its petition covering Spanish imports in January 1985, 50 Fed.Reg. 3949 (Jan. 29, 1985).

it would be inconsistent for a petitioner, such as USX, that had withdrawn a petition (and thereby avoided the risk of a final negative determination by the Commission) in order to obtain the perceived benefits of a VRA, to argue at some later date that the imports covered by the withdrawn petition should be cumulated because the Commission *might* have issued a final *affirmative* determination of injury in an earlier case.

Defendants' Brief at 65.[19]

Plaintiff also argues that ITC acted in a manner contrary to law when it refused to cumulate imports from Brazil with respect to which ITC had rendered a negative injury determination in September 1984. *See Cold-Rolled Carbon Steel Sheet from Brazil,* USITC Pub. 1579, Inv. No. 731–TA–154 (September 1984). In support of this decision, several commissioners conclude that imports subject to a previous negative injury determination may not be considered unfairly traded and are, therefore, inappropriate candidates for cumulation. Plaintiff contends that the negative ITC determination is irrelevant to the decision whether to cumulate and that cumulation is justified based on the determination that the imports were sold at less than fair value.

As indicated, plaintiff does not dispute that the cumulation doctrine should be applied to analyze the hammering effect of less than fair value or subsidized imports only, but argues that ITC's conclusion that imports are fairly traded when the domestic industry withdraws its petitions shortly before a final determination, or where the imports were subject to a previous negative injury determination, is "an abuse of discretion, inconsistent with the purpose of the [cumulation] doctrine and contrary to basic common sense." Plaintiff's Reply Brief at 26. "[F]or the purposes of a cumulation analysis," plaintiff contends, "if the imports which are candidates for cumulation have been found to be unfairly traded by [ITA], the propriety of cumulation is determined solely by the existence of a factual connection between the candidates for cumulation and imports subject to the instant investigation." *Id.* at 28.

■ In order to resolve this dispute, the court must answer two questions. First, when may imports be considered "unfairly traded" so that they may be considered as candidates for cumulation analysis?[20] Second, under what circumstances do such candidates cease to be appropriate subjects for cumulation? As stated in the previous opinion, "[c]umulation is a method of assessing the volume and price effects of imports from a particular country by examining the volume and effect of imports from that country together with like imports from other countries." *USX,* 655 F.Supp. at 491 n. 5. It is not in dispute that it is only appropriate to cumulate unfairly traded imports. Plaintiff apparently accepts the concept that if injury could be established by cumulating all imports,

**19.** Several commissioners have refused to cumulate the imports of South Africa and Spain subject to countervailing duty determinations because of previous countervailing duty orders concerning those imports. *E.g.,* Remand Determination at 60. *See Steel Products from South Africa,* 47 Fed.Reg. 39,379 (Sep. 7, 1982); *Steel Products from Spain,* 48 Fed.Reg. 51 (Jan. 3, 1983). In support of this position the commissioners argue that once duties are in effect, these imports must be considered fairly traded and "cannot logically be combined, in a decision made after the date of the order, with current unfairly traded imports as a cause of injury." *Id.*

The existence of countervailing duties does not automatically render imports "fairly traded" if the same imports have been the subject of a less than fair value determination, as imports from Spain were here. Countervailing duties are intended to offset rates of subsidization, not margins of dumping, and it is entirely possible that imports subject to such duties might still be dumped to the detriment of U.S. industry. Countervailing duties, however, may cause imports to demonstrate trends in the U.S. market distinct from those of other countries' imports. Because of the court's ruling on withdrawn petitions in the antidumping case, it is unlikely that the issue of whether relevant conditions of trade warrant cumulation as to any imports from Spain will be reached on remand.

**20.** Plaintiff appears to utilize the term "unfairly traded" in the sense of an ITA affirmative less than fair value or subsidy determination. Defendants use it in the sense of both the presence of margins or subsidies and causally related injury. For ease of expression, the court will use the term, hereafter, as plaintiff does.

whether unfairly traded or not, then injury could be found to be caused by fairly traded imports. Such a result would seem to be contrary to both the letter and spirit of the antidumping laws, which require a causal link between unfairly traded imports and material injury to domestic industry before remedial measures may be taken. 19 U.S.C. § 1673 (1982).

■ A requirement that cumulated imports be unfairly traded is not, however, a requirement that all imports cumulated be causes of material injury if considered independently. This distinction is fundamental. Whether or not imports are unfairly traded for the purpose of cumulation analysis is not and cannot be the same inquiry as whether or not imports have been traded in violation of the antidumping provisions of the Act. A decision to cumulate cannot be predicated on a determination that imports from a particular source are by themselves a cause of material injury precisely because it is the purpose of cumulation doctrine to allow causation of material injury to be established in cases where the cumulated sources are not capable of being found injurious when viewed independently. Circular reasoning regarding this issue has been expressly rejected by this court on several occasions, most recently in *Fundicao Tupy S.A., et al. v. United States*, 12 CIT ——, Slip Op. 88-3, at 7 (Jan. 12, 1988) (three-judge panel), *appeal docketed*, No. 88-1233 (Fed.Cir. Feb. 11, 1988). Thus,

failure to consider cumulation if a negative injury determination has been made, where cumulation with the imports under investigation here was not addressed and rejected in the other proceeding, presents logical problems. To a lesser degree, a similar problem also exists with regard to withdrawn petitions.

It would appear that as a simple matter of logic, any imports which are found to be unfairly traded during the period of investigation, in the sense of an affirmative ITA less than fair value or subsidy determination, should be candidates for cumulation, whether such imports are the subject of a negative injury determination or a withdrawn petition.[21] As the purpose of cumulation is to avoid a negative injury determination when unfairly traded imports from various sources together injure an industry, it follows that the fewer limitations which are put on eligibility for cumulation the more likely would be the certainty of avoiding improper negative injury determinations. On the other hand, as everyone agrees, causation analysis is not an exact science. Thus, too broad a use of cumulation might result in some improper affirmative injury determinations.

Plaintiff has not cited any case in which ITC cumulated imports subject to negative injury findings or withdrawn petitions. Defendants, however, have cited several cases in which ITC has acted as it has here.[22]

21. It is appropriate for ITC to decline to cumulate imports with respect to which ITA has made no determination prior to withdrawal of a petition or a negative determination, as it cannot be said and will not be determined, that such imports are unfairly traded. As indicated, plaintiff does not appear to dispute this limitation of the cumulation doctrine. It, therefore, seems inconsistent for plaintiff to argue that South African imports are appropriate subjects for cumulation because they were "unfairly traded," Plaintiff's Brief at 41–42, when ITA had not yet issued a preliminary determination at the time the petition with respect to those imports was withdrawn. Plaintiff's statement that "Commerce ... issued [an] affirmative preliminary determination[ ] [with respect to South African imports] in March of 1984" is incorrect. *Id.* at 41. *See,* 49 Fed.Reg. 23,670 (Jun. 7, 1984).

22. Defendants have cited one investigation governed by pre–1984 Act discretionary cumulation

in which ITC expressly refused to cumulate imports subject to a previous negative injury determination, *Potassium Chloride from U.S.S.R.*, USITC Pub. 1656, at 7 n. 27, Inv. No. 731–TA–187 (March 1985), and other pre–1984 Act investigations in which ITC purportedly could have cumulated certain other country imports but did not because of withdrawn petitions. *See, e.g., Leather Wearing Apparel from Uruguay*, USITC Pub. 1144, Inv. No. 701–TA–68 (May 1981) (Imports might have been cumulated with those under investigation in *Leather Wearing Apparel from Brazil, Korea and Taiwan*, Inv. Nos. 701–TA–65 to –67, but were not after the petition was withdrawn with respect to those three countries. 45 Fed.Reg. 76,553 (Nov. 19, 1980)). In these latter investigations, cited by defendants, the cumulation issue was not addressed in the reasoning of the determinations. Defendants have also cited several investigations governed by the provisions of the 1984 Act

■ It is admitted that prior to 1984 cumulation was a general concept accepted by ITC. The parameters of the doctrine of cumulation, however, were ill-defined. If one accepts the view that cumulation was a non-statutory expedient to avoid a series of negative decisions where material injury was caused by a combination of imports from various sources, ITC would seem to be at liberty to define a reasonable scope to the pre–1984 doctrine of cumulation. As ITC created the doctrine, ITC could limit it in a non-arbitrary manner that is not inconsistent with the basic purpose of cumulation. Although defendants have stated the permissible scope of the doctrine too narrowly, some limits involved here are acceptable. It was not arbitrary or unreasonable to decline to cumulate imports in this investigation with those from investigations where agency determinations, particularly as to the less than fair value or subsidy aspect,[23] are not subject to testing by judicial review because petitions are withdrawn or negative injury determinations are unchallenged.[24]

Some Brazilian imports, however, may remain viable for cumulation purposes because the conclusiveness of ITA's subsidy determination in the countervailing duty investigation was not negated by the unchallenged finding of lack of causally related injury by ITC in the antidumping investigation.[25] To say that the negative injury

determination in the antidumping case prevents cumulation is both to ignore cross cumulation and to read the negative injury determination in the antidumping case incorrectly as a decision resolving the issue of cumulation with Argentine imports.[26]

Two commissioners did reach the next stage of analysis and found that Brazilian imports exhibited different trends in the U.S. market distinct from those of other countries' imports. As the court stated in the previous opinion, under pre–1984 law these distinctions alone may justify a decision not to cumulate, provided such trends reflect actual differences in the way imports affect the domestic market. *USX*, 655 F.Supp. at 492. As there is no legally sustainable majority on this point, Brazilian imports covered by the countervailing duty determination must be addressed on remand.[27]

■ Plaintiff also challenges ITC's decision not to cumulate imports of Argentina with those of Korea. Two commissioners base their decisions not to cumulate on differences in import trends, pricing patterns and geographic markets served. These distinctions properly justify a decision not to cumulate Argentine and Korean imports. A third commissioner declines to cumulate the Korean imports because of a subsequent ITC determination that those

(investigations initiated on or after October 30, 1984) in support of this practice. *See, e.g., Carbon Steel Structural Shapes from Norway*, USITC Pub. 1785, at 8, Inv. No. 731–TA–234 (November 1985).

23. Defendants' counsel limited its argument on this point to the lack of final affirmative injury determinations. The commissioners' concerns seem to cover all phases of the investigation.

24. In *Cold–Rolled Carbon Steel Sheet from Brazil*, USITC Pub. 1579, Inv. No. 731–TA–154 (September 1984), it does not appear that petitioner, United States Steel Corporation (now USX) argued that the subject imports from Argentina should be cumulated with less than fair value imports from Brazil. Although petitioner instituted an action challenging ITC's negative injury determination, it voluntarily dismissed that challenge in October 1985. *United States Steel Corp. v. United States*, No. 84–11–01589 (CIT Oct. 21, 1985) (order of dismissal).

25. ITC reached an affirmative injury determination in the countervailing duty investigation. *Certain Carbon Steel Products from Brazil*, USITC Pub. 1538, Inv. Nos. 701–TA–205 to –207 (June 1984).

26. Defendants have not argued administrative *res judicata*, and its elements appear to be lacking here.

27. Although an affirmative countervailing duty order with regard to Brazilian imports was issued during the period of the investigation, at least one commissioner found it too recent to affect the unfairly traded status of the goods. Remand Determination at 60. Two commissioners found the existence of a countervailing duty order grounds for not cumulating Brazilian imports, but they did not discuss timing, which appears to be relevant to a proper resolution of the issue of the effect of a countervailing duty order under pre–1984 precedent. Remand Determination at 6, 34.

imports threatened material injury but did not cause it.

Defendants argue that the subsequent threat determination establishes that the Korean imports had not actually caused any injury and that it would be inappropriate to cumulate *"actual* blows" with *"potential* blows" that did not land during the period investigated. Defendants' Brief at 80. Plaintiff responds that ITC may not base its decision not to cumulate on a threat determination which occurred after the subject investigation, and that cumulation was proper in light of ITA's determination that these imports were unfairly traded during the entire period of the instant investigation. Plaintiff's Brief at 40.

Assuming *arguendo* that the court accepts plaintiff's view as to what information may be considered on remand, the information relevant to the Korean threat determination was available prior to the original determination here. Implicit in defendants' explanation of the commissioner's decision is the concept that imports which only ·threaten injury affect the domestic market differently from imports which actually injure. The court is unclear, however, as to what the commissioner means in citing to a statement rejecting cumulation in arriving at a threat determination as opposed to cumulation of threatening and actually injurious imports. Remand Determination at 35 (citing *Certain Welded Steel Pipes and Tubes from Turkey and Thailand,* USITC Pub. 1810, Inv. No. 701–TA–253 (February 1986)). Thus, the issue of cumulation of Korean imports has not been resolved properly.

In sum, Mexican, Spanish and South African imports need not be a part of cumulation analysis. Cumulation of Brazilian imports subject to a countervailing duty determination and Korean imports must be addressed further.

## III. THREAT OF MATERIAL INJURY

In the previous opinion, the court held that "ITC's failure to request production

capacity data for 1984 prevented it from performing a thorough analysis on the question of material threat." *USX,* 655 F.Supp. at 498. Consideration of the most recent capacity utilization data was essential, reasoned the court, because of ITC's almost exclusive reliance on this data in formulating its negative determination.

▆ Pursuant to the court's instruction, ITC collected new evidence regarding Argentine production capacity utilization for 1984. The data showed a relatively small drop in capacity utilization, thus suggesting that Argentine producers lacked the ability to further invade the U.S. market so as to threaten imminent harm.[28] ITC concluded that this additional information confirmed their original negative finding with respect to threat.

Plaintiff argues that the capacity utilization data relied on by ITC is "inherently suspect," Plaintiff's Brief at 47, and that ITC erred in failing to rely instead on certain data which plaintiff submitted. *Id.* at 49. An examination of the record and ITC's decision based upon that record indicate these arguments are ill-founded.

In support of its accusation that the capacity utilization data relied on was "inherently suspect," plaintiff claims that the nature of a threat investigation demands a review of quarterly data because "only capacity utilization data for the most recent period will permit a true evaluation of a real and imminent threat." *Id.* at 48. Plaintiff argues ITC erred in relying on annual figures submitted by counsel for Propulsora.

▆ As defendants note, "the line of argument presented by USX has been rejected repeatedly by this Court and should be rejected again in this case." Defendants' Brief at 91. ITC is given broad discretion in setting the time frames for its analysis and these circumstances in no way mandate the quarterly analysis preferred by plaintiff. *E.g., American Spring Wire Corp. v. United States,* 8 CIT 20, 26, 590

---

**28.** This issue is separate and distinct from the issue of whether present material injury was

caused by Argentine imports.

F.Supp. 1273, 1279 (1984), *aff'd sub nom. ARMCO, Inc., et al. v. United States,* 760 F.2d 249 (Fed.Cir.1985). Furthermore, reliance on customary annual data is especially warranted in this case given seasonal fluctuations in production levels which would likely skew the reliability of quarterly figures.[29]

Plaintiff finally argues that ITC's negative determination regarding threat of material injury cannot be upheld in light of evidence it submitted to ITC which "unequivocally demonstrated the existence of significant excess production capacity among Argentine producers of cold rolled sheets in 1984." Plaintiff's Reply Brief at 34. The court disagrees. Although the *Mercado* article, *supra* n. 29, provides a general overview of the problems facing the Argentine steel industry in early 1985, it does not, along with the other public information submitted by plaintiff, provide

sufficient evidence to find that ITC's conclusion, drawn from sufficiently recent data collected specifically on the products under investigation in this case, was not based on substantial evidence.

This matter is hereby remanded to the ITC for further consideration consistent with this opinion. ITC shall file its decision on remand within 45 days hereof. Plaintiff will have 15 days from filing to respond. Defendants may reply within 10 days thereafter.

SO ORDERED.

---

**29.** Evidence of these seasonal fluctuations is contained in an article entitled "The Steel Crisis" published in the March 1985 issue of *Mercado,* which was submitted into evidence by plaintiff. Public Record Document Number 86, at Ex. 1. The article contains the statement by Fernando Freytes, general manager of Propulsora Sidurgica that "[s]ince the months of December and January are traditionally low with regard to production levels due to seasonal factors, in general, the companies will continue to experience high percentages of idle capacity in their plants." *Id.* at p. 2.